Stella C. FOGG

v.

**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY.**

**Civ. A. No. 3367.**

United States District Court,
D. New Hampshire.

Aug. 14, 1972.

Charles G. Douglas, III, Perkins & Douglas, Concord, N. H., for plaintiff.

Jack B. Middleton, McLane, Carleton, Graf, Greene & Brown, Manchester, N. H., for defendant.

## OPINION

BOWNES, District Judge.

This is an action against the New England Telephone and Telegraph Company (hereinafter Company) alleging a violation of the 1964 Civil Rights Act, Subchapter VI, 42 U.S.C.A. § 2000e–2(a). Jurisdiction is based on 42 U.S.C.A. § 2000e–5(f).

The plaintiff alleges that she was not promoted from a job category known as Customer Communication Specialist (hereinafter CCS) to that of Communication Consultant 1 (hereinafter CC1) in May of 1970 because she was a female. She further alleges that she was warned by the Company not to file a charge with the Equal Employment Opportunity Commission (hereinafter EEOC) and that subsequent to her announcing her intention of filing and of filing a charge with the EEOC, she was continually harassed by her male supervisors and forced to resign from the Company. The plaintiff filed a written complaint with the EEOC on June 1, 1970, and, after investigation, the EEOC made findings of fact on February 17, 1971. Both parties objected to the findings and a letter to sue was issued by the EEOC. The plaintiff filed her complaint in this court on June 29, 1971.

The case was given a firm trial date of July 6, 1972, in December of 1971. On May 22, 1972, plaintiff sought to amend the complaint into a class action on behalf of all female persons "who are employed or might be employed as either Customer Communications Specialists (CCS) or Communications Consultant, Level 1 (CC1) by the New England Telephone and Telegraph Company." This motion was denied because of laches and because it raised problems as to venue. I indicated at the hearing on the motion, however, that if, as alleged by the plaintiff, the defendant had engaged in discrimination against women in the consultant communication specialist category, I had ample powers to take whatever action was necessary.

## THE FACTS

A. *Plaintiff's Employment History*

Plaintiff entered the employment of the defendant on March 24, 1964, as a telephone sales representative in the Boston office. This department, known as "Tell Sell," was limited exclusively to women employees but had men as supervisors and managers. She was a conscientious employee and received regular increases in pay. Ex. B, p. 1. In March of 1965 she received a certificate as an

outstanding "sales*man*." [Emphasis added.] Ex. 24. On March 1, 1967, she was promoted to the position of administrative supervisor. She continued in that position until April of 1968 when a long strike by Company employees commenced. Because of the demands caused by the strike, the plaintiff was assigned to Providence, Rhode Island, as a switchboard operator and then to the switching system. She performed competently in both capacities. After the strike was over, her position as administrative supervisor was phased out and she was offered a job as a CCS. The plaintiff considered this a demotion. The Boston Sales Supervisor, Joseph Connors, described the position of administrative supervisor in the management hierarchy as being: "one notch below a CCS and five notches below a CC1." He felt the transition from administrative supervisor to CCS was a parallel step and not a step down. The transition from administrative supervisor to CC1 would have been a definite step upwards and Connors felt that the plaintiff did not warrant such promotion. The plaintiff took the CCS job reluctantly because she felt she was being demoted. She attended a six weeks training course that had four or five men and four women in the class. Although the course was the same, the men were all slated for CC1 jobs and the women for CCS positions. After completing the course satisfactorily, the plaintiff informed Connors that she was going to work very hard and expected to be promoted to a CC1.

A brief description of the job requirements for CCS and CC1 is necessary. Both are concerned with the selling of Company service and equipment ranging from an additional phone line to the installation of a complex intercommunication system. Those in the CCS category were supposed to handle routine demand sales, i. e., sales made primarily at the customer's specific request. The CC1 personnel were expected to study and analyze a customer's needs and then develop a program to meet those needs.

CCS personnel were also supposed to assist and work with CC1 personnel. While the distinction between the two job categories existed on paper, it was often breached in practice. All of the CCS personnel were women and up until 1971 and 1972, almost all of the CC1 personnel were men.

The plaintiff handled her CCS job in Boston competently from October of 1968 to March of 1969. In January or February of 1969, she and her husband decided to move to New Hampshire and they put their house on the market. She stopped in at the Manchester office of the Company and told Mr. Roberts, the supervisor, that she hoped to get a position as a CCS in Manchester. He told her that there was no CCS opening, but there was a CC1 opening. She discussed the matter of a transfer from Boston to Manchester with her supervisors and was told that there was no CCS opening in Manchester. After she pointed out that there was a CC1 opening, she was told that this could only be filled by a man. She did not ask for a promotion to CC1 at this time, but concentrated on getting transferred to Manchester as a CCS. Her attempts to obtain a transfer to Manchester as a CCS ran into opposition by her supervisors, particularly Gregory Collins. Her absentee record, which was not exemplary, Ex. B, p. 11, was one of the reasons given for refusing to transfer her. She was also told by Mr. Collins to funnel any further grievances through proper channels. Ex. B, pp. 57, 58, and 59. Her request for a transfer was refused and she was ordered to report to work at Milk Street in Boston after her vacation. She then wrote a letter directly to Mr. Barry, President of the Company. This resulted in her transfer to Manchester as a CCS effective May 12th. It seems clear that the CCS position in Manchester was created to accommodate her. While her letter to Mr. Barry brought results, it also ruffled the bureaucratic feathers of her immediate superiors by going over their heads.

Immediately after she began work in Manchester, the plaintiff informed her immediate superior, Mr. Blanchard, that she was going to work very hard to become a CC1. Blanchard told her that there were no women CC1's, but if the policy changed, she would be considered. There is a conflict in the testimony as to the plaintiff's performance in Manchester as a CCS. She is of the opinion that her work was superior to that of the other CCS's and that shortly after she started in Manchester, she was really doing the work of a CC1. In contrast, her supervisors, all male, testified that she was not doing CC1 work at all, that her CCS work was not up to par, and she did not deserve a promotion to a CC1. The criticism of her work focused on four basic areas: abrasiveness in dealing with fellow employees; refusal to accept constructive criticism; incomplete knowledge of equipment; and inaccuracy in writing orders.

There was a great deal of testimony about the Pilgrim Furniture account. The plaintiff's supervisors used this account as an example of inaccurate ordering and failure to know the type of equipment available. The plaintiff, on the other hand, felt that whatever mistakes were made in regard to this account were made by other personnel and not herself.

Naturally, all of her supervisors denied that her sex had anything to do with their unfavorable appraisal of her work. The plaintiff continually informed her supervisors that she expected to be promoted to a CC1. The Company policy of promotion from CCS to CC1 is set forth in Exhibit 23:

> Candidates for promotion from the position of C.C.S. to that if C.C.I. are selected on the basis of demonstrated job performance, individual strengths and aptitudes as reported by immediate supervisors. Other factors are also considered such as self development efforts, special skills and flexibility towards residence relocation.

> An employee may be recommended for promotion at any time if their performance should warrant such action and each employee is reviewed at least once a year through an appraisal system.

> Recommendations for promotion by immediate supervisors are reviewed with the next level of supervision for concurrence and submitted to the General Sales Manager for consideration. The final selection is normally made by the General Sales Manager for that area.

Things came to a head after the plaintiff's second presentation of a proposed installation to National Cash Register. Her immediate supervisor, Paul Kotseos, had accompanied her to the presentation. The plaintiff felt that he interfered with her presentation and downgraded her. Kotseos' opinion was that the plaintiff did not know the answers to some of the questions asked and that her information was not accurate. After the presentation was over, the plaintiff told Kotseos, when he started to "critique" her, that she expected now to be promoted to CC1. He said that he could not recommend a promotion, particularly based on her faulty presentation of the National Cash Register account. She then informed him: "If no promotion, than I'm going to the EEOC." This was on May 18, 1970. From then on, according to the plaintiff, she was subjected to daily harassment by her immediate supervisors, Roberts and Kotseos. Both denied any intentional harassment, but there is no doubt that the plaintiff was working under considerable emotional stress and pressure. There was continual friction and strain between herself and her immediate supervisors.

On June 18th Roberts asked her if she wanted to resign, to which she replied she would if she received termination pay. Roberts refused. She then went out of his office and called the EEOC and, after the call, again informed Roberts that she would sign a resignation if

she received termination pay. She went home and wrote a letter of resignation "effective upon the receipt of one year's salary." Ex. L. This was presented to Roberts the next day, June 19th, who told her that this demand was impossible, but that the Company would pay her one week's pay for each year of employment plus vacation pay. The plaintiff then wrote out the letter of resignation that was accepted and predated it to June 18th. Ex. M. There was no specific discussion of the pending EEOC complaint. Roberts thought the resignation and payment of termination pay ended the whole matter, but there was no demand by the Company that the complaint be dropped.

## SPECIFIC FINDINGS AND RULINGS

█ 1. I find that the Company's refusal to promote the plaintiff was not primarily because of her sex. In the first place, it is to be noted that there was no specific CC1 opening when the plaintiff demanded promotion. This is not the usual situation where a male is promoted instead of a female. If I assume, and as will be evident, this is purely an assumption, that the Company was ready to promote a woman to the position of CC1 in Manchester in May or June of 1970, it is extremely unlikely that the plaintiff would have been that woman. Mrs. Fogg had a knack for stepping on her supervisors' toes if they got in her way. She was an aggressive, ambitious employee determined to push her way ahead. She went over the heads of her supervisors in Boston by writing directly to the President of the Company. She demanded, not requested, a promotion. From the time she started work in Manchester, the plaintiff made it abundantly clear that she was going to insist on being promoted to a CC1. While these traits are supposedly ones that make for success in business, they also run counter to the tendency of any

bureaucratic hierarchy to perpetuate itself and protect its members against any sudden change or disruption of the established routine. Her "Job Development and Enrichment" appraisal, Ex. B, p. 71, shows that what the Company required at this management level was primarily conformity and the ability to get along with other personnel. The actions of Mrs. Fogg were neither calculated to win friends nor gain supervisor approbation.[1]

Moreover, the plaintiff's entire Employee Record, Ex. B, does not substantiate her claim that she was doing an outstanding job as a CCS. Her ambition outran her capabilities. Judgment and leadership were not her strong suits.

2. I further find that the plaintiff was not warned against filing a complaint with the EEOC. To the contrary, it was the plaintiff who warned her supervisor that failure to promote her would result in a complaint to the EEOC.

3. I also find that the plaintiff was not deliberately harassed or pressured into resigning. The strain that the plaintiff felt herself under after her promotion was refused and she announced her intention to file a complaint with the EEOC was due mainly to her own reaction to the Company's refusal to promote her. She had the option of continuing as a CCS pending determination of her complaint or resigning. She must certainly have understood that, with the complaint pending, the Company was in no position to either fire her or overtly discriminate against her. She resigned voluntarily.

█ The defendant asserts that the resignation and acceptance of the termination pay bars this action. It cites three cases as authority: Bowe v. Colgate-Palmolive Co., 272 F.Supp. 332 (S.D.Ind.1967); Oubichon v. North American Rockwell Corp., 325 F.Supp. 1033 (C.D.Cal.1970); Washington v. Aerojet-General Corp., 282 F.Supp. 517 (C.

---

1. It is to be noted that pursuant to Company policy, the initial recommendation for promotion from CCS to CC1 comes from the immediate supervisor of the CCS employee. Ex. 23.

**650**

D.Cal.1968). None of these are pertinent. *Bowe* was reversed as to the holding on which the defendant relies; Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969). In *Oubichon* and *Washington,* the plaintiffs pursued their rights through the Union's grievance procedure, accepted the Company-Union settlement and returned to work. I have found no cases exactly on point, but accept as a guideline the following language in *Bowe*:

> When, as frequently happens, the alleged discrimination has been practiced on the plaintiff because he or she is a member of a class which is allegedly discriminated against, the trial court bears a special responsibility in the public interest to resolve the dispute by determining the facts regardless of the position of the individual plaintiff. At page 715.

I rule that the voluntary resignation by the plaintiff and her acceptance of termination pay is not a bar to this suit.

B. *The Defendant's Policy of Promotion from CCS to CC1*

In Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970), the court held:

> The very nature of a Title VII violation rests upon discrimination against a class characteristic, i. e., race, religion, sex or national origin. Bowe v. Colgate-Palmolive Company, 416 F.2d 711, 719 (7th Cir. 1969). At page 428.

The language of *Bowe, supra,* is instructive:

> Moreover, in an action brought under Title VII, the charging party and suing plaintiff acts as a private attorney general who "takes on the mantel [sic] of the sovereign." Jenkins v. United Gas Corp., 400 F.2d 28, 32 (5th Cir. 1968). See also Oatis v. Crown Zellerbach Corp., 398 F.2d 496

(5th Cir. 1968). At page 715 of 416 F.2d.

■ I, therefore, proceed to the question of whether or not in May of 1970 the plaintiff did discriminate against women in its policy of promotion from CCS to CC1.[2] A careful study of all of the exhibits makes it evident that, at least up until 1971, women were not generally considered candidates for top or medium level management positions. Contrast Ex. 1 with Ex. 2, 3, and 4. See also Ex. 8 and 9. It must be borne in mind that 52.3% of all the Company employees were women. As of December 31, 1971, there were 883 men and 12 women holding third level and above management positions, in second level management there were 1,762 men and 133 women and first level management jobs had 4,171 men and 1,665 women. Ex. E, chart entitled "Work Force Goals."

"Ma Bell's" voice to the public may be the feminine voice with the smile, but the voice of command and decision is a gruff masculine one. This situation did not result from a conscious and studied policy of sex discrimination, but rather reflects the mores and standards of our society which have not come under scrutiny and challenge until very recently. The testimony of Mrs. Gould who stated, in effect, that sex discrimination was an inevitable part of a woman's everyday life is instructive in this regard.

With this background, the conclusion is inevitable that, at least, up until June of 1970, the position of CCS was considered to be the exclusive domain of women employees and that of CC1, with sufficient exceptions only to prove the rule, to be for men. The first sheet of Exhibit O graphically illustrates the promotion policy of the Company. Between 1964 and 1968, no women had been promoted from CCS to CC1. In 1969 there was one promotion; in 1970, four; in

---

2. In *Parham, supra,* the court held at page 425 of 433 F.2d:
The crucial issue in a lawsuit of this kind is whether the plaintiff establishes hiring bias at the time of his rejection for employment and subsequent complaint to the EEOC, not the employment practices utilized two years later.

1971, ten; and in the first six months of 1972, nine promotions were made.

In September of 1968 there were about 100 CC1's, but, of these, only two were women. Mr. Connors testified frankly that he could think of no good reason except "historical" why women could not fill the job. I suspect that one of the real reasons for having a CCS category distinct and inferior to that of a CC1 category was the accepted but unproven assumption by the Company that men could handle complex installations better than women and that customers would prefer dealing with men in matters involving complex and technical communication systems. This, of course, was in turn based on the generally accepted societal assumption that, except in certain fields such as cooking and sewing, men are by nature better equipped to handle mechanical, technological, and manual tasks.[3]

I find that as of May and June of 1970 the Company did discriminate against women in its promotion policy from CCS to CC1. I also find that starting at least in 1971 the Company, despite its male dominated management, has been making a creditable effort to end such discrimination. See Affirmative Action Program, New England Tel. & Tel., April 1972. Ex. E.

While Mrs. Fogg was not denied promotion because she was a woman, she did perform a valuable public service by instituting the complaint with the EEOC and bringing this law suit. The sharp increase in the number of female promotions from CCS to CC1 in the years 1970, 1971, and 1972 may possibly have been due to a sudden awakening on the part of the Company of its responsibilities under the Equal Opportunities Employment Act, but it is more probable that Mrs. Fogg's forceful actions opened the eyes of the defendant to the male oriented promotion policy that it had been following.

Mrs. Fogg is, therefore, entitled to reasonable attorney's fees and costs as authorized by 42 U.S.C.A. § 2000e–5(k). Parham v. Southwestern Bell Telephone Co., *supra*. Plaintiff's counsel will submit a proposed statement of fees and costs to the court, with a copy to opposing counsel, as soon as possible.

So ordered.

---

3. This is as far as the decision requires me to go in evaluating extant sociological distinctions between men and women. An inherited biological bias also precludes further objective comment.