Willie Eugene **ROBERTS**, Plaintiff,

v.

**ST. LOUIS SOUTHWESTERN RAIL-
WAY COMPANY**, Defendant.

**No. PB 68–C–20.**

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Aug. 12, 1971.

George Howard, Jr., Pine Bluff, Ark.,
Barbara A. Morris, New York City, for
plaintiff.

John Lile, Pine Bluff, Ark., for defend-
ant.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

The plaintiff, Willie Eugene Roberts,
brings this action against the defendant,
St. Louis Southwestern Railway Com-
pany, a corporation, seeking injunctive

relief restraining the Defendant Railway from maintaining and pursuing a policy of racial discrimination and otherwise interfering with rights of the plaintiff to employment on the basis of race and color or to equal employment opportunities. The plaintiff further seeks an injunction requiring the defendant to restore him to the position he held with the defendant, including his seniority rights and a judgment for the pay he would have received as an employee of the company had his services not been terminated.

This action is brought under the provisions of 28 U.S.C.A. § 1343; 42 U.S.C.A. §§ 1981 and 1983; and 42 U.S.C.A. § 2000e et seq. (Title VII of the Civil Rights Act of 1964).

The plaintiff is a Negro citizen of the United States residing in Pine Bluff, Arkansas. The defendant, St. Louis Southwestern Railway Company, is a corporation organized under the laws of the State of Missouri with offices in Pine Bluff, Arkansas, and is engaged in the shipment of freight by rail in interstate commerce. The defendant railway company effects interstate commerce and employs more than fifty employees.

In April, 1966, the plaintiff made application with the defendant for employment as a fireman. As usual procedure, he was given a physical examination by Dr. Ross Maynard, the examining physician for the railway company. The examination included the taking of x-rays. From the physical examination, the plaintiff was tentatively approved with the doctor's report to the defendant that from his examination Roberts met the physical qualifications for the job. On April 25 he was notified to report for work the next day, commencing April 26.

On reporting for duty David T. Hopkins, Road Foreman of Engineers for the railway, explained to the plaintiff the duties of a fireman. He was assigned to Engineer Hinchley under whose supervision he was to work during his training period. In the meantime, Foreman Hopkins instructed the plaintiff to report any serious difficulties, such as fights among employees as the railway did not permit such altercations. He need not report minor problems, but if any serious incidents occurred, he was to notify Foreman Hopkins immediately. It is acknowledged that the Plaintiff Roberts was the first black employee in the railway company's yard at Pine Bluff, Arkansas, as a fireman.

With some difficulty Roberts located Engineer Hinchley, climbed into the engine compartment with him where his instruction was to begin. Another employee of the defendant on the engine asked Roberts if there were "any more of your kind coming on the job?" The unidentified employee, according to Roberts, stated further that they "could take care of it" themselves (referring to the employees) if any other Negroes appeared. It is undisputed that the plaintiff reporting for duty as a fireman on the defendant's engine was unacceptable by the other employees. They appeared to be somewhat hostile and there was little communication between them during the plaintiff's training process. There was a lack of co-operation on instruction as to the nature of the work as a fireman. The plaintiff was to watch the crew designated to train him, but it was necessary that he make numerous inquiries in order to learn the work he was expected to perform.

On his second day of training, he was directed by the supervisor to the engine of an engineer employed by the defendant, a Mr. Tubbs. On entering the engine he observed a Ku Klux Klan symbol above on the inside of the engine cab. It was subsequently removed by one of the brakemen and apparently designed to discourage Roberts continuing his period of employment with the railway company. A day later one of the brakemen, as a member of the crew under whom he was receiving instructions as a trainee, attempted to discourage him from going on his assigned run.

Although he received some training and resentment from other employees with whom he was working Roberts did not think he was receiving instructions

as white trainees in the movement of trains. He reported his difficulties to the foreman. In recognition of the problem with the other employees, the foreman went with him to the yard and personally demonstrated to Roberts how to move the train.

Later during the week while working as an outside hostler there was a mix up with his train crew and by invitation of another employee he went to another part of the yard to move a train under the supervision of Supervisor Colburn.[1] The plaintiff informed Foreman Walker of his problem and difficulty after Walker had admonished him for not being on the scene when the hostlers returned to the train the previous night.

He continued to receive the required training primarily with company supervisors and several days later he was assigned for a trip to Shreveport, Louisiana. On arrival in Shreveport he reported to the tower to have papers signed in accordance with general procedure. He was there advised by defendant's employees that he had a "bad spine" or a "bad back" and that his employment was being terminated. Subsequently, he returned on one of the defendant's trains to Pine Bluff. He made inquiry of his foreman, Hopkins, about his discharge and was advised that he was being terminated for medical reasons.

On being advised that his employment was being terminated for medical reasons, the plaintiff consulted his regular physician Dr. Frank Bryant, a general practitioner, with reference to the reported spinal defect. Finding no disability, the doctor referred Roberts to Dr. John M. Hundley, an orthopaedic surgeon, and a member of the American Academy of Orthopaedic Surgeons. From examination and x-rays of this plaintiff's spine and back, Dr. Hundley's diagnosis revealed a curvature of the spine, but no bone involvement and

therefore, concluded that any curvature of the spine is "irrelevant" to the plaintiff's ability to work and did not indicate any "pre-disposition to back difficulties".

It is undisputed that the plaintiff has a history of athletic participation in high school and college. It is contended that his acknowledged athletic ability, skill and prowess in high school and college sufficiently demonstrates that he does not have a "disabling defect".

The x-rays taken by the defendant's examining physician in Pine Bluff, Dr. Ross Maynard, the day before the plaintiff commenced work April 26, 1966, were forwarded to Dr. William Richard Siebold,[2] at Texarkana. Dr. Siebold is a radiologist regularly employed by the defendant railway company to make such examinations. The Cotton Belt [3] Hospital for the defendant's employees is located in Texarkana. Dr. Siebold takes no x-rays, but receives them from local doctors throughout the system of the railway company for the purpose of interpretating and reporting his conclusions as to medical qualifications of applicants. It is established that his decision on interpretation of x-rays from all applicants is final and the policy of the company is to be guided accordingly. It is undisputed from the testimony and exhibits that the handling of all pre-employment physicals are consistent and uniform. In the instant case, Dr. Siebold concluded that from x-rays of the plaintiff's spine he had a disqualifying condition which was a pre-disposition to a potential back injury.

The primary question for the Court's determination is whether the facts from the testimony and exhibits in the case, the plaintiff's termination of employment by the defendant May 5, 1966, was due to his race or color or it was the result of a medically determined defect caused by a steep lumbosacral angle of

1. Referring to Mr. Kalkbrenner, supervisor of engine personnel.

2. Dr. Siebold is the company's Chief Surgeon at its employees' hospital in Texarkana.

3. The defendant company is also known as the Cotton Belt Railway.

the spine. There are two other issues in this proceeding that have some bearing on the final determination: (1) that statistical evidence in the case is sufficient to sustain a violation of Title VII of the Civil Rights Act of 1964, and (2) alleged harassment and hostility by employees of the defendant toward the plaintiff.

Jurisdiction is admitted and established. 28 U.S.C.A. § 1343(4); 42 U.S.C.A. §§ 1981 and 1983; 42 U.S.C.A. § 2000e–5(f).[4]

No question is raised as to the educational achievement, ability, or qualification of the plaintiff to perform the duties as a fireman with the defendant railway company. Prior to 1965, the defendant consistently employed the policy of hiring no black personnel for the position of fireman on its locomotives. After the passage of the Civil Rights Act of 1964, the defendant changed its policy and initiated a program of accepting and considering applications in all of its personnel requirements without racial consideration. The evidence is undisputed that the company sought black applicants for various positions, including firemen. The plaintiff's application was one of several accepted for processing and consideration from black applicants. At the time of the trial of the case the company had employed nine black firemen as the need occurred. Most of the other 267 firemen at the time were longtime employees with years of experience.

From the testimony and exhibits produced at the trial of the case, the defendant for years maintained a policy of requiring certain basic physical qualifications for employment. All applicants whether black or white are required to submit to the same physical examinations. It is established that from other applications processed during the time of the plaintiff's application that there was a consistent procedure with the handling of the applications as well as the results. Similarly, it was established employment applications processed during 1965, 1966 and 1967 that the percentages for failure to hire due to medical reasons were consistent and there was a high percentage of applicants turned down due to medical reasons, including back conditions.

The testimony of the defendant, which is undisputed, establishes reasons for rather stringent physical requirements. A railroad is not subject to state compensation law. It is subject to the Federal Employee's Liability Act which has no limit to the amount of employee's claim for on-the-job injuries. Personnel injury claims by employees are historically high. A substantial percentage of the claims are due to back injuries. In view of this history in the railroad industry, the Association of American Railroads adopted standards recommended by Dr. Ferguson as to the tolerance of the lumbosacral angle of the spine. It is further established and undisputed that in 1964 the defendant railway company adopted the Association of American Railroads' standards and has consistently applied the standards for physical requirements as a prerequisite to employment.[5] Pursuant to this policy, numerous applicants failed to qualify for employment as a result of the condition of the spine to the degree as determined by the Ferguson theory adopted by the Association of American Railroads and the defendant.

It is quite apparent that the plaintiff's orthopaedic witness, Dr. Hundley, professionally disagrees with the Dr. Ferguson theory with reference to the lumbosacral angle of the spine and its pre-disposition toward back injuries. The

---

4. Plaintiff fulfilled jurisdictional prerequisites to enforcement of Title VII rights by filing timely charge with EEOC, receipt of notice that suit may be brought within thirty days and filing of this action within the time.

5. The theory of Dr. Ferguson on the condition of the spine is that a curvature in excess of sixty degrees indicates predisposition to back pain. The standards adopted by the AAR is to the effect that any applicant with a curvature of approximately sixty degrees or greater is disqualified.

plaintiff discounts this conflict between the two medical opinions and contends that considering the nature of Roberts as the first black fireman trainee, the conditions existing during his tenure and the manner of his discharge, the validity of the reasons for the discharge as claimed by the defendant is more than questionable. The plaintiff further contends that the reasons given do not stand scrutiny and the medical evidence supporting the decision is insufficient and the termination of his employment is racial rather than medical.

However, the plaintiff's medical expert, Dr. Hundley, had access to the same x-ray taken by the defendant's doctor at Pine Bluff, interpreted by the defendant's Chief Surgeon and Radiologist at Texarkana, compared it with the x-ray that he, Dr. Hundley, took of the plaintiff, and both showed there was a curvature of the spine of the plaintiff. Dr. Hundley testified one showed 58 degrees and the other 60 degrees. The defendant's medical expert, Dr. Siebold, interpreted the x-ray in excess of 60 degrees. It is also established that Dr. Siebold did not know at the time of interpreting the x-ray of the plaintiff's back that he was black.

■ It is not the prerogative of the Court to determine between the opinions of these two acknowledged medical experts in the field of radiology. Neither is it necessary for the Court to determine whether the Ferguson theory of tolerance is correct or Dr. Hundley's opinion in adopting the 1970 Symposium of the Orthopaedic Society is correct. The fact remains that both medical conclusions reveal that the plaintiff had a curvature of the spine of about the same degree.

■ The Court concludes from the testimony and exhibits that the defendant railway company pursued a consistent policy of accepting applications and employment of its personnel or denying employment on the basis of the conclusions and opinions of its Chief Surgeon as to physical requirements of the applicants. The Court further concludes and it is established without contradiction that the Chief Surgeon and Radiologist of the defendant company interpreted and reported to the company that the Plaintifff Roberts was disqualified due to his failure to meet the physical requirements consistently adhered to by the defendant. The Court is also of the opinion that the standards with reference to the tolerance of the curvature of the spine adopted by the Association of American Railroads and by the defendant railway company, known as the Dr. Ferguson theory, are reasonable. It is also established and the Court concludes that the railway company in good faith accepted the opinion of its chief medical officer that the plaintiff was disqualified medically and for that reason failed to continue the plaintiff in its employment as a fireman.

■ Since the Court reaches the above conclusions from the testimony of the witnesses, exhibits, answers to interrogatories and the entire record, it follows that the reason that the company rejected the plaintiff for employment was not on account of his race. Although the company's discrimination practices of employment against blacks prior to 1965 furnishes a strong inference that Roberts may have been rejected for employment because of racial consideration, such a presumption is not conclusive. Parham v. Southwestern Bell, 433 F.2d 421, 428 (8 Cir. 1970). Accordingly, Roberts' claim for injunctive relief cannot be sustained. It also follows that his claim for back pay should be rejected.[6]

Having reached this conclusion, it is unnecessary that the Court give further consideration to the other two issues present in this proceeding, the statistical record and alleged harassment and hostility by employees. However, in view

---

6. The plaintiff has the burden to establish by a preponderance of the evidence unlawful employment practices. Dewey v. Reynolds Metal Company, 429 F.2d 324 (6 Cir. 1970).

of the record, the Court deems it advisable to comment on these two questions.

The plaintiff's reliance on Parham v. Southwestern Bell, supra, is misplaced. In that case the Plaintiff Parham sought relief individually and on behalf of blacks as a class. Our Eighth Circuit Court of Appeals sustained the district court's findings that Parham was not entitled to individual relief, but the class action should stand. The cited language in *Parham*, supra, at page 426, has reference to the class action as contended in that proceeding. In the instant case, the Plaintiff Roberts does not allege class action suit under Rule 23 of the Federal Rules of Civil Procedure.

Furthermore, at the beginning of the trial counsel for both parties stipulated and agreed that the case did not involve relief as a class action pursuant to the rules.

■ It is recognized that the company's extremely low number of black employees in 1968, at the time of the bringing of this suit and since, reflect a disinclination of implementing the defendant company's announced policy of equal employment opportunities and it may very well be shown that "statistical" evidence would demonstrate discriminatory practices as applied to the class of blacks in general. The preponderance of the evidence, however, is not weighted on the side of the plaintiff as an individual.

As to the question of "harassment", it is acknowledged that the appearance of the first black fireman as a trainee provoked employees of the defendant in this area and caused some sensation and even hostility. It is unquestioned that the discontent among the employees manifested itself in harassment which to some extent escalated throughout the period of the plaintiff's training. Obviously the appearance of the Ku Klux Klan symbol, though brief it was, indicated an actual threat, and especially when considered with comments and epithets from some fellow-employees.

The plaintiff contends that this was a factor in causing the company to discontinue his employment. It is argued the action of the employees should be equated or charged to the defendant company. No case is cited to sustain this contention and the court does not agree that it is sustained by the record.

Mr. David T. Hopkins, Road Foreman of Engineers for the defendant railway company, apparently recognized this sensitive problem among the employees at the outset. It is undisputed that Mr. Hopkins personally explained the duties of a fireman. He cautioned the plaintiff about serious difficulties and instructed him to report any that might occur to him personally and immediately. Furthermore, in an attempt to overcome the reaction from the other employees, supervisory personnel gave their personal attention to the plaintiff in his training as a fireman.

During his testimony the plaintiff frankly admitted that at no time during his training period was he harassed or threatened with hostility by any supervisor or management personnel of the defendant company. He explained at least two incidents in which the company supervisory personnel upon their own initiative assisted him in the movement of engines in the yard where he was receiving instructions as a trainee. The Court concludes that the attitudes displayed by certain employees of the company and their actions did not control the policy of the defendant, nor did they enter into the decisions made by the defendant with respect to the plaintiff in this case.

This memorandum opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

In accordance with the Court's findings and conclusions, and opinions expressed therein, an order will be entered denying the relief requested by the plaintiff and dismissing the complaint.