**Johnny WINFREY, plaintiff,**

v.

**METROPOLITAN UTILITIES DISTRICT, a Municipal Corporation, Defendant.**

**No. CIV. 77-0-225.**

United States District Court,
D. Nebraska.

March 6, 1979.

Benjamin Wall, Mary Kay Green, Omaha, Neb., for plaintiff.

C. S. Brubaker, W. L. Strong, Merlin E. Remmenga, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This civil rights action alleges that the defendant, Metropolitan Utilities District, Omaha, Nebraska (hereinafter MUD), discriminated against the plaintiff, Johnny E. Winfrey, a black man. This matter is brought pursuant to Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981, and the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The case was filed on July 18, 1977, and the matter was tried to the Court without a jury. The following represents the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff has alleged that MUD discriminated against him as a meter reader in the following manner:

1) By consistently assigning the plaintiff to routes that whites are not assigned to, requiring more work and involving greater hardship than other routes, which has detrimentally affected his health.

2) By refusing to promote plaintiff to the position of re-read at a higher salary to which he is entitled by seniority.

3) By defendant allowing plaintiff's supervisor to harass the plaintiff with derogatory racial epithets.

4) By refusing to process his vouchers and papers to take advanced education.

The plaintiff filed several complaints with the Human Relations Board of Omaha, the Nebraska Equal Opportunities Commission, and the Equal Employment Opportunity Commission. A right-to-sue letter was issued on June 17, 1977. This suit was brought within ninety (90) days on July 18, 1977. Mr. Winfrey prays for relief, exemplary and compensatory damages, back pay and promotion in addition to costs and attorney fees.

The facts are these. MUD is a municipal corporation serving the metropolitan area of Omaha and environs with natural gas and water. Consumption of gas and water is measured by meters at the location of all customers. MUD has divided the metropolitan area of the city into seven hundred walking meter reading routes. These are grouped into twenty-one meter reading districts. Each route is designed to be read in one day and contains approximately three hundred thirty meters. There are, however, significant variations in the actual number of meters per route, depending on such facts as the distance between meters and whether meters can be read without entering the building or home. A meter reader will read approximately two hundred forty-three routes per year.

MUD tallies the number of reading errors and the number of "skips" made by each meter reader. Errors occur when a meter is read incorrectly. A "skip" arises when a

meter is not read at all. There can be several reasons for a skip: if the customer is not home or does not admit the meter reader, the location will be skipped; if the meter reader does not make sufficient effort to gain a response from the customer and is not allowed to enter the house; if the meter reader intentionally bypasses a home or building; or if physical obstacles prevent access to the meters. If the meters are on the outside of the house, as is often the case with newer homes and buildings, meter readers normally have very few skips.

The routes in the near north side of Omaha (approximately the area between Cuming and Fort Street, and from Sixteenth to Thirtieth Street) present difficulties for meter readers. The homes in this area are older, some having unfinished dirt cellars with poor or non-existent lighting. In addition, such neighborhoods are populated by poorer families wherein both spouses are wage earners and, consequently, not at home during the day to allow a meter reader to enter the home. Plaintiff read the following number of routes in the near north side: in 1969 (only four months)—forty routes; 1970—one hundred sixty-six routes; 1971—one hundred twenty-seven routes; 1972—one hundred thirty-five routes; 1973—eighty-five routes; 1974—thirty-nine routes; 1975—twenty-four routes; 1976—twenty-three routes; 1977—twenty-four routes. When these figures are compared with the total number of routes that could be read in a year, two hundred forty-three routes, it is clear that prior to 1973, plaintiff was assigned to the near north side routes over one-half of the time. In addition, the evidence in the case established that other black meter readers had equally high percentages of routes in the near north side at that time. There is no evidence indicating how the remaining routes in the near north side were divided among white meter readers.

In September, 1973, plaintiff, along with two other black meter readers, Arnold Ewing and Hobart Johnson, met with three MUD supervisors, Curtis Jensen, general supervisor, Earl Larson, supervisor of meter reading, and Harold Higgins, field foreman, to complain about route assignments. The black meter readers felt that they were being assigned a disproportionate number of routes in the near north side, a practice which was unfair since the near north side routes were less desirable and more difficult than routes in other areas of the city. They proposed that meter readers be assigned routes in all areas of the district in equal proportions. The MUD supervisors did not agree that the near north side routes were more difficult and less desirable, but agreed nevertheless to redistribute routes in the manner proposed by the black meter readers. MUD began to implement the policy on October 3, 1973. Due to the large number of routes and MUD's practice of reassigning routes to new readers each six months, the changeover could not be effected over night. Nevertheless, the evidence is clear that by early 1974, the routes had been redistributed.

In 1974, plaintiff, Arnold Ewing and a Nebraska state senator, Ernest Chambers, met with MUD supervisory personnel to discuss MUD employment practices and in particular, the promotion of black employees within the company. Shortly after this meeting, Arnold Ewing was promoted to the collection department.

Plaintiff argued that MUD's policy of assigning him as a black meter reader to the north side has detrimentally affected his chances for promotion and pay increases and has affected his health. Plaintiff contended that the near north side routes necessarily resulted in a higher skip percentage and error rate for readers with those routes: there are a higher proportion of vacant homes or homes where both spouses are working during the day precluding meter readers from entering homes, thereby resulting in a "skip;" the homes in the near north side are older and often have unfinished dirt cellars and poor lighting, making it difficult to see and causing reading errors. Plaintiff argued that his error rate and skip percentage was higher because of his near north side routes and consequently, he had been denied promotion and salary increases.

Plaintiff was denied salary increases on two occasions during his employment with MUD. On both occasions, each occurring in 1970, he was denied a raise because of his excessive skip percentage and reading errors. On these occasions, plaintiff's skip percentage was not only higher than the average skip percentage for all meter readers, but was higher than the average skip percentage for black meter readers who also read routes predominantly in the near north side. If the skip percentage was a result of the nature of the near north side routes, plaintiff's skip percentage should not have been higher than the skip percentages of the other meter readers in the near north side. The MUD records introduced by the plaintiff indicate that plaintiff's error rate during this period was highly erratic, ranging from two hundred thirty-nine meters read per error for one month, to eight hundred four meters read per error for another month.

Also in evidence are charts comparing average annual skip percentages and error rates from 1970 to 1977 for plaintiff, the division as a whole, all black meter readers and all white meter readers. Plaintiff's skip percentage increased over the years: his skip percentage was lower during the years when he had a high proportion of routes on the near north side than during the time when he had an equal distribution of routes throughout the city. The chart indicates that all skip percentages increased from 1970 to 1977, but plaintiff's percentage increased more than the division skip percentage, the skip percentage for black meter readers, or the skip percentage for white meter readers. The tally of plaintiff's average meters read per error is as follows:

| | METERS READ PER ERROR | NUMBER OF NEAR NORTH SIDE ROUTES |
| --- | --- | --- |
| 1970 | 356 | 166 |
| 1971 | 388 | 127 |
| 1972 | 446 | 135 |
| 1973 | 672 | 85 |

| | METERS READ PER ERROR | NUMBER OF NEAR NORTH SIDE ROUTES |
| --- | --- | --- |
| 1974 | 472 | 29 |
| 1975 | 473 | 24 |
| 1976 | 418 | 23 |
| 1977 | 426 | 24 |

It is true that the number of meters read per error increases from 1970 to 1973 while the number of near north side routes generally decreases, a positive correlation. However, after 1973, the number of meters that plaintiff read per each of his errors decreases. Plaintiff's best year was 1973 when more than one-third of his total routes were in the near north side. In 1977 when he had an almost equal distribution of routes throughout the city, his record was worse than in 1972 when more than one-half of his routes were in the near north side. This evidence does not establish that reading near north side routes detrimentally affected plaintiff's error rate or his skip percentages.

In 1976, plaintiff applied for promotion to Meter Reader-Reread, but was rejected. Instead, MUD hired a black man, Carlos Galloway, with less seniority than the plaintiff. Plaintiff argues that he should have been awarded this position on the basis of his seniority. All applicants for the position were evaluated comparing error frequency, complaints, attendance record and education for the preceding two years, a time period when the routes had been equally distributed among meter readers. Skip percentages were not part of this evaluation. Out of the eight applicants, the plaintiff was tied with another applicant for the lowest evaluation.

This Court finds that the plaintiff has not presented a prima facie case of discrimination in the employment promotion context. The elements essential to a prima facie case are:

(A) prima facie case of failure to promote because of racial discrimination is made by showing: (i) that plaintiff be-

longs to a racial minority; (ii) that he was qualified for promotion and might have reasonably expected selection for promotion under the defendant's on-going competitive promotion system; (iii) that he was not promoted, and (iv) the supervisory level employees having responsibility to exercise judgment under the promotion system betrayed in other matters a predisposition towards discrimination against members of the involved minority. *Pettit v. United States,* 488 F.2d 1026, 1033, 203 Ct.Cl. 207 (1973); *Haire v. Calloway,* 572 F.2d 632 (8th Cir. 1978).

The evidence clearly established that the plaintiff was denied the promotion because he was one of the least qualified applicants. MUD promoted another black applicant to the position and there is no evidence of racial discrimination in the promotion decision.[1]

■ The plaintiff complained that MUD refused to process his reimbursement vouchers for educational expenses thereby discriminating against him by denying him educational opportunities provided to other employees. MUD argues that this issue cannot be raised in the district court since plaintiff failed to file a complaint with the EEOC in regard to this problem. In light of the decision on the merits, the Court will not consider this procedural question.

The evidence does not support this complaint. The first incident occurred in 1975 when plaintiff enrolled in a math course at Technical High School. A precondition to reimbursement by MUD was the submission of an itemized receipt and final grades. Plaintiff failed to submit his grade slips for several months but when he did, MUD reimbursed him immediately. The second incident occurred in 1976 when plaintiff attempted to enroll in two economics courses at the University of Nebraska at Omaha. MUD informed UN-O that it would pay for his tuition as soon as it received a state-

ment from UN-O. UN-O failed to send the statement and plaintiff was never properly enrolled. Deduction from his pay check, totaling $30.76 was reimbursed to him promptly. There was no evidence that MUD wrongfully denied plaintiff any educational benefits.

■ On September 16, 1975, Harold Higgins, field foreman in the meter reading department, allegedly insulted the plaintiff by referring to him as "boy" in the course of a conversation concerning plaintiff's attendance at a staff meeting. Plaintiff complained to his supervisors about the incident and Mr. Higgins personally apologized to plaintiff for the comment. However, plaintiff requested that Mr. Higgins be given a written reprimand for the incident. The matter was brought to the attention of MUD general manager, Robert Bell, who investigated further. Mr. Bell felt that Mr. Higgins had exercised poor judgment in the situation, but found no evidence of "racial discrimination or any malicious intent to degrade" the plaintiff and wrote a letter to Mr. Higgins to this effect. Furthermore, Mr. Bell ordered that copies of his letter and other statements concerning the incident be placed in Harold Higgins' file as written evidence of the oral reprimand.

Derogatory comments can be "so excessive and opprobrious as to constitute an unlawful employment practice under Title VII." *See Rogers v. Equal Employment Opportunity Commission,* 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). However, this isolated incident falls far short of rising to the level necessary to constitute a violation of 42 U.S.C. § 2000e-5 or § 1981. There is no credible evidence that plaintiff was subjected to racial epithets of this nature either prior to or subsequent to the 1975 incident. *See Cariddi v. Kansas City Chiefs Football Club,* 568 F.2d 87 (8th Cir. 1977).

---

1. Very clearly, Title VII does not demand that an employee be placed in a position for which he is not qualified. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiff has not challenged the evaluation process or the standards and guidelines used in this instance.

Plaintiff has claimed that the discriminatory treatment by MUD has detrimentally affected his health. He suffered a hernia in 1973 as a result, he alleges, of strenuous activity while reading near north side routes. Those routes often require meter readers to jump down into dirt cellars to read meters where there are no stairs or ladders. In October, 1976, plaintiff suffered an "acute anxiety reaction" and was unable to work for three weeks, allegedly as a result of harassment he received at MUD.

Punitive or compensatory damages cannot be recovered under 42 U.S.C. § 2000e et seq. However, such damages are recoverable under 42 U.S.C. § 1981. *See Presseisen v. Swarthmore College,* 71 F.R.D. 34, 45 n. 12 (E.D.Pa.1976). The applicable statute of limitations for a claim pursuant to 42 U.S.C. § 1981 is three years, and in this action all matters arising prior to July 18, 1974, are barred by the statute of limitations. Accordingly, this Court need not decide whether the hernia suffered by the plaintiff in 1973 was a result of discriminatory conduct by MUD since that action is barred by the statute. In regard to the alleged acute anxiety reaction occurring in 1976, the evidence was wholly insufficient to establish that this reaction was the result of racially discriminatory conduct by the officials at MUD.

In light of the findings and conclusions set forth herein, it is unnecessary for the Court to decide whether any or all of these claims suffered from procedural filing defects under 42 U.S.C. § 2000e and § 1981.

A separate order will be entered this day in accordance with this memorandum opinion dismissing the complaint.