**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

and

**Ray Wells, Intervenor,**

v.

**MURPHY MOTOR FREIGHT LINES, INC., Defendant.**

Civ. No. 3–76–191.

United States District Court,
D. Minnesota,
Third Division.

April 2, 1980.

Roger Duncan, Equal Employment Opportunity Commission, Indianapolis, Ind., for plaintiff.

Gerald M. Singer, Meshbesher, Singer & Spence, Ltd., Minneapolis, Minn., for intervenor.

David R. Hols and Alice O'Brien Berquist, Felhaber, Larson, Fenlon & Vogt, P. A., St. Paul, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

MacLAUGHLIN, District Judge.

This is an action for injunctive relief, backpay, and attorney's fees brought by plaintiff, the Equal Employment Opportunity Commission (hereinafter "EEOC") and intervenor Ray Wells, under 42 U.S.C. § 2000e et seq. (hereinafter "Title VII"). Plaintiff and intervenor contend that de-fendant Murphy Motor Freight Lines, Inc. (hereinafter "Murphy") has systematically discriminated against and harassed minority employees in contravention of Title VII. The Court, having considered all of the evidence presented at trial and the arguments of counsel, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court has jurisdiction over the subject matter of this dispute under 28 U.S.C. §§ 451, 1343 and 1345.

*The Parties*

Plaintiff Equal Employment Opportunity Commission is an administrative agency of the United States government charged with the enforcement of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Intervenor Ray. L. Wells is a black male citizen of the State of Minnesota. Defendant Murphy Motor Freight Lines, Inc. is a Minnesota corporation with its principal office and place of business in Roseville, Minnesota, where it is engaged in the motor freight business. At all times relevant to this action, defendant Murphy employed 25 or more persons.

*Procedural Background*

On August 5, 1974, Ray Wells made a written amended charge of discrimination (TMK2–0211) naming as respondents Murphy and the International Brotherhood of Teamsters Local No. 120. The EEOC deferred Wells' amended charge to the State of Minnesota Department of Human Rights pursuant to § 705(b) of Title VII and the Department waived jurisdiction of the charge on August 6, 1974. Wells' amended charge was filed with the EEOC on August 6, 1974, and was timely filed within 180 days of the alleged unlawful practices. The charge alleged that Wells had been discriminated against because of his race.

On December 10, 1974, after the EEOC investigated the charge, Wesley N. Harry, District Director of the EEOC, issued with respect to Wells' charge a Letter of Determination, bearing the case number YMK5–282, which was served upon Murphy. Following the Determination, conciliation ef-

forts were made. These attempts at conciliation failed and on February 24, 1976, defendant Murphy was notified to that effect. Murphy failed to request that attempts at conciliation be reopened following its receipt of the District Director's notification of conciliation failure.

On June 1, 1976, the EEOC filed this suit. Wells was granted leave to proceed as intervening plaintiff on August 3, 1978.

*Wells' Employment*

Intervenor Wells was employed by defendant Murphy as a dockman at its Roseville, Minnesota, terminal from May of 1967 until his discharge in July of 1974. Wells claims that Murphy has violated Title VII in two ways: 1) by failing to provide for him a work environment free of racial hostility, intimidation, and harassment; 2) by discharging him while similarly situated white employees were not discharged. The Court agrees with Wells' first claim and rejects the second claim. The Court also is persuaded that the EEOC's claim that Murphy has violated Title VII is correct.

### 1. *Oppressive working conditions*

42 U.S.C. § 2000e–2(a)(1) provides that an employer may not "discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race . . . ." The Court is convinced that racial harassment occurred at Murphy which violated Title VII.

Racial harassment has for some time been recognized as a violation of Title VII. The EEOC has ruled that an employer is responsible for maintaining a "working environment free of racial intimidation," and that the requirement includes "positive action where positive action is necessary to redress or eliminate employee intimidation." EEOC Dec. 72–0779, 4 FEP Cases 317 (1971); EEOC Dec. 72–1561, 4 FEP Cases 852 (1972), *noted in* B. Schlei & P. Grossman, *Employment Discrimination Law* 237 (1976). Title VII prohibits "the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Rogers v. EEOC*, 454 F.2d

234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

An analysis of case law dealing with instances of racial harassment has revealed two primary conditions for a finding that Title VII has been violated.

First, more than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir. 1977), are accidental, or are sporadic do not trigger Title VII's sanctions. *Winfrey v. Metropolitan Utilities Dist.*, 467 F.Supp. 56, 60 (D.Neb.1979); *Friend v. Leidinger*, 446 F.Supp. 361, 382–83 (E.D.Va. 1977); *Croker v. Boeing Co. (Vertol Div.)*, 437 F.Supp. 1138, 1191 (E.D.Pa.1977); *Fekete v. U. S. Steel Corp.*, 353 F.Supp. 1177, 1186 (W.D.Pa.1973).

The testimony at trial conclusively proved that Wells was subjected to vicious, frequent, and reprehensible instances of racial harassment, which occurred in several guises.

Freight at Murphy is manually unloaded by workers on the loading dock and placed on carts. The carts move around a track; the freight is thereby conveyed to other parts of the building. They make a complete revolution through the dock every eight minutes. On each cart is a blackboard approximately one foot square, on which is written the destination of the freight. The carts were the vehicles for slurs against blacks in general and Wells in particular. John Buhl, one of the loading dock employees, testified that the chalkboards contained such epithets as "Ray Wells is a nigger," "The only good nigger is a dead nigger," "Ray Wells is a mother," "Send all blacks back to Africa," and "Niggers are a living example that the Indians screwed buffalo." The example concerning buffalo at times referred specifically to Ray Wells. Other employees substantiated these allegations. Former employee Peter Sarafolean saw a cart sign indicating that "Ray Wells is a nigger." Steven Mudge, a

supervisor, stated that he saw two signs referring to "niggers." In one instance, he saw a wooden cross identified with the Ku Klux Klan on a cart. Another supervisor, Patrick White, noted that a sign referred to the Klan. The same or a similar incident was confirmed by Daniel Johnson, another supervisor, who testified that he saw one cart carrying a cross with the words "f_ _ _ nigger." Wells himself observed one sign suggesting that Archie Bunker should be elected President because "he would know how to handle niggers."

Sentiments similar to those appearing on carts were found on and inside truck trailers near the loading dock. Supervisor Mudge observed signs on the trucks, one of which said "Ray Wells sucks." Lawrence Hicks, Jr., a black former employee, noticed that the phrase "Ray Wells is a nigger" was inscribed inside trailers.

The atmosphere of racial hostility at Murphy was especially strong in the company lunchroom. Wells testified that

> one table became the Ray Wells table and no one ate there but Ray Wells. On this table, as we took our 10-minute breaks and lunch hours, licorice dolls, candy licorice dolls were placed on the table with little notes about your mother, nigger and things of this nature, comments made on pieces of paper here and there. At one point I was somewhere like in the middle or three-fourths of the cafeteria and one guy on this side of the room would holler to a guy on this side of the room. He would say, "What are you reading?" The guy would say, "I am reading a book about a black guy named Sambo. He's got a pancake." Things of that nature.

While there is conflicting testimony as to the cause, Wells began to eat lunch in a separate room (the so-called "warm room") on the loading dock. When Wells and Lawrence Hicks began to eat in the warm room, words were scratched into or written on the door specifying that the area was for "niggers only" or that it was a "nigger lunchroom." Apparently the hostility was orchestrated by a clique of four or five employees, who sat at their own table in the lunchroom. Known as the "Swamp Rats," they characteristically referred to blacks, both privately and in front of Wells, as "niggers." The *de facto* leader of the group informed a supervisor that he did not want to work near Wells.

Anti-black sentiments were expressed in other ways as well. The company's bulletin board was the situs of an article or articles derogatory of black persons. Racially oriented graffiti was found in the restrooms and on a wall near the entrance to the loading dock. The tires of Wells' car were slashed and a foul-smelling substance was put in his shoes.

The record as a whole shows that the racial harassment that Wells experienced was not isolated, casual, accidental, or sporadic. Rather, the incidents were a "concerted pattern of harassment," *Fekete v. U. S. Steel Corp.*, 353 F.Supp. 1177, 1186 (W.D. Pa.1973), and were "so excessive and opprobrious as to constitute an unlawful employment practice under Title VII." *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir. 1977).

Second, plaintiff must show that the employer failed "to take reasonable steps to prevent racial harassment . . . ." *Croker v. Boeing Co. (Vertol Div.)*, 437 F.Supp. 1138, 1191 (E.D.Pa.1977). At what point management must be deemed to be aware of racial harassment by employees and must take affirmative steps to remedy the situation is disputed. Some courts have refused to find Title VII violations unless supervisory personnel actually participated in the harassment. *Clark v. South Central Bell Tel. Co.*, 419 F.Supp. 697, 706 (W.D.La. 1976); *Ostapowicz v. Johnson Bronze Co.*, 369 F.Supp. 522, 537 (W.D.Pa.1973); *Roberts v. St. Louis Southwestern Ry. Co.*, 329 F.Supp. 973, 978 (E.D.Ark.1971); *Compston v. Borden, Inc.*, 424 F.Supp. 157, 160 (S.D. Ohio 1976).

That standard has been met in this case. Supervisory personnel participated in the harassment of Wells by their delay in removing the derogatory article from the company bulletin board. Indeed, one of the

supervisors laughed about the article. Further, supervisory personnel told Wells that if he "worked out" Murphy would hire more blacks, and commented to him that his failure to work harder than white employees was a "disgrace to his race."

■ The Court believes, however, that the standard for a violation of Title VII should be stricter than that of actual participation by management and supervisory personnel. If management knows or should know of incidents of racial harassment that are more than sporadic, it has a responsibility to take reasonable affirmative steps to eliminate such incidents. *See Croker v. Boeing Co. (Vertol Div.)*, 437 F.Supp. 1138, 1194 (E.D.Pa.1977) (one may infer from intensity of harassment that management was aware or should have been aware); *United States v. Lee Way Motor Freight, Inc.*, 7 FEP Cases 710, 748 (W.D.Okl.1973); *Anderson v. Methodist-Evangelical Hospital*, 4 FEP Cases 33, 35 (W.D.Ky.1971) (employer may not "wash . . . hands like Pilate and simultaneously bleat of piety").

In this case, Murphy management and supervisors knew and should have known of the numerous instances of racial harassment by Murphy employees. Four or five employees on more than one occasion told Steven Mudge, one of Wells' supervisors, that they did not want to work with Wells because he was black. Mudge was aware that they commonly used the term "nigger." He heard from other employees that the warm room had a "nigger lunchroom" sign and was aware that carts on the line carried racial epithets. Patrick White, Daniel Johnson, and Ronald Bina were directly aware that racial harassment was occurring. Those who were not directly aware should have been: Wells repeatedly complained to the supervisors and management about instances of racial slurs and derogatory statements.

The steps that Murphy took to prevent racial harassment were inadequate. Apparently no clear company policy against racial discrimination or harassment existed. Some of the witnesses at trial remembered that racial epithets had been discussed at a safety or union meeting, but their memories concerning the nature of the meeting, when it took place, or what was discussed were hazy. Murphy's management and supervisors were quiescent in promoting good race relations.

Company officials testified that they did not take strong steps to remedy racial harassment because to do so might stir up further racial feelings. However, this Court believes strong steps are necessary to ascertain and to sensitize or, if necessary, discipline the prejudiced clique of employees who were the prime offenders. That group, which was primarily responsible for the harassment, succeeded in arousing the feelings of other employees against Wells.

## 2. *Wells' discharge*

■ Wells was terminated for violating Murphy's Rule 4e. Rule 4e provides that employees must notify supervisors of their intent to leave the loading dock area during the lunch break. Evidence at trial indicated that Rule 4e is somewhat vague, in that it is not clear whether a freight loader must notify his supervisor or whether he may notify the superintendent, who is in charge of the entire shift. Further, the rule is apparently considered unreasonable by some employees because they sometimes must wait for a few minutes until they find a supervisor to notify. However, it is clear that Wells did not notify anyone and, further, whether or not Rule 4e is considered unreasonable by some employees is, for the purposes of this case, irrelevant. Absent racial motivation an employer may discharge an employee for violating a company rule.

■ A plaintiff establishes a *prima facie* case of a Title VII violation if he or she shows that: 1) plaintiff belongs to a racial minority; 2) plaintiff was discharged; and 3) sufficient evidence of disparate treatment exists from which the court can infer a causal connection between race and the discharge. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282, 96 S.Ct. 2574, 2579, 49 L.Ed.2d 493 (1976).

Plaintiff has obviously satisfied the first two criteria. The critical question is whether Wells' discharge was racially motivated.

Sufficient evidence of disparate treatment does not exist to allow the Court to infer a causal connection between Ray Wells' race and his discharge. When Wells was discharged for violating Rule 4e, a white employee was also discharged for the same violation. Wells' treatment was therefore by definition not disparate. The white employee did surmise at trial that he had been discharged in retaliation for complaining about safety violations. However, no evidence was introduced to support his speculation. Intervenor's counsel further suggested that the white employee was discharged to mask Wells' illegal firing. That suggestion is unsupported by the record.

It is true, of course, that not every employee who violated Rule 4e was discharged. But even if the assumption is made that Wells, a black, was discharged while white employees who also violated the rule were not, Murphy has articulated, and proved, a legitimate non-discriminatory reason for Wells' termination. *See McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1975). It is clear that Wells was the lowest producer at Murphy, and also had one of the worst disciplinary records.

A combination of rules violations, insubordinate attitude, and low productivity is sufficient to negate any alleged causal link between race and discharge. *See Windom v. City of St. Louis*, 568 F.2d 78 (8th Cir. 1977); *Stevens v. Junior College Dist. of St. Louis*, 548 F.2d 779, 782 (8th Cir. 1977); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892, 895–96 (8th Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Harberson v. Monsanto Textiles Co.*, 17 FEP Cases 99, 101 (D.S.C.1976). A review of Wells' work record reveals those three characteristics.

Wells was a chronic company rulebreaker, and had one of the worst disciplinary records of any of the employees. A plethora of warning letters and personnel disciplinary reports directed to and concerning Wells were introduced at trial. Wells was reprimanded for consistently defying and violating a company rule against changing clothes during working time, continual tardiness in arriving for work, failing to call in sick, spending too much time in the bathroom (Wells was purportedly the worst offender), leaving his work position during working hours, and using the company telephone for personal calls. Further, he repeatedly violated Rule 4e and was continually reprimanded and warned that further violations could lead to termination. Although Murphy's disciplinary system is somewhat subjective, testimony at trial conclusively demonstrated that the subjective nature of the process was not used to mask the reasons for Wells' discharge. Although Wells' supervisors knew or should have known about racial harassment, no evidence was introduced indicating that they singled him out for discipline because he was black.

Second, Wells' attitude toward supervision was bad. On a number of occasions Wells would deliberately load only one piece of freight on each cart, significantly slowing the freight operation. He was reprimanded many times for such conduct. These tactics did not endear him to his fellow employees, especially on Friday nights, when the employees could go home early if they had all finished their work. On one occasion, Wells insisted on working with one hand while he held a transistor radio to his ear with the other. Wells' negative attitude was also revealed by his use of abusive and profane language to supervisors and by his reaction to criticism and suggestions. On one occasion, he spit on the floor before his supervisor and uttered an obscenity when reprimanded. Another time he received a letter of reprimand, tore it up, and threw it on the floor near his work station.

Third, Wells' productivity was substandard. At the time of his discharge he was the lowest producer on the loading dock. Apparently Murphy expects that dock workers will load between four and five thousand pounds of freight per hour. During one production survey, it was deter-

mined that Wells was the lowest producer, loading 1,600 to 1,800 pounds per hour. Two other employees were listed at 2,500 pounds, and all of the rest were over 3,000. Supervisors, in assigning men to various teams would attempt to put some low producers and some high producers in each group. Wells was treated as a "zero" in determining the personnel of various crews; he could make a three to four thousand pound load last for six hours. Consequently, supervisors would often assign Wells to pull empty carts off the loading line instead of asking him to perform his regular job, unloading the trucks.

Murphy did attempt to fire Wells for low production, but the Teamsters Union forced his reinstatement on the ground that there was no "load factor" that employees were required to meet. At trial Wells refused to state whether his productivity was good or bad because he felt that he could not be required to produce. His statements about, and attitude toward, work suggest that Murphy had ample reason to fire someone who refused to do his fair share of the labor.

Defendant has thus articulated and proved that there were valid reasons for Wells' discharge.

Intervenor's response is that his rules violations, insubordinate attitude, and low productivity were a reaction to racial harassment. *See Dual v. Griffin*, 446 F.Supp. 791, 801–802 (D.D.C.1977) (illness, causing lost leave time, was caused by harassment and retaliation); *Young v. Southwestern Savings & Loan Assoc.*, 509 F.2d 140, 144 (5th Cir. 1975) (working conditions may be so intolerable as to amount to constructive discharge). The Court is not persuaded that a sufficient causal link between harassment and Wells' poor work has been demonstrated. Wells stated that his aggression was "inflamed within me . . . for a long time" before he started work at Murphy. The Court is convinced, based upon all the evidence, that Wells' discharge was not caused by or related to his race or color, but was based upon his long record of poor work performance and, specifically, upon

the violation of Rule 4e. Further, the evidence completely supports the finding that he was not treated disparately in his discharge and that the treatment accorded to him for his violation of the rule was not related to his race or color.

■ Alternatively, even if one assumes that Wells' work performance was an inverse function of the harassment he received, the Court is reluctant to hold, for two reasons, that rules violations and minimal production are thereby justified. First, retaliation against the employer is essentially self-help, which is not favored when plaintiff has not exhausted all legal remedies. Second, a claim that poor work performance is caused by harassment opens a Pandora's box of problems with respect to determining causation.

Consequently, because intervenor did not prove the requisite connection between his race and his discharge, no backpay or lost pension benefits will be awarded to him.

*Attorney's fees for Ray Wells*

■ A court may in its discretion award the "prevailing party" in a Title VII lawsuit reasonable attorney's fees. 42 U.S.C. § 2000e–5(k) provides that:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

Ray Wells is a prevailing party in this lawsuit and is entitled to such fees.

■ Wells proved that the racial harassment he experienced constituted a violation of Title VII. Wells was thus "successful in court," *Pearson v. Western Electric Co., Etc.*, 542 F.2d 1150, 1153 (10th Cir. 1976); *Williams v. General Foods Corp.*, 492 F.2d 399, 408 (7th Cir. 1974), one criterion used to determine whether a party has prevailed. That Wells did not prove that his discharge violated Title VII does not preclude an award of attorney's fees; such costs may be awarded if a party prevails on any signifi-

cant issue. *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978).

No backpay or individual injunctive relief is awarded to Wells in this case. However, it has long been recognized that a plaintiff need not receive individual relief to be entitled to attorney's fees; if the plaintiff's lawsuit benefits others, fees are appropriate. *Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721, 726 (8th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973) (class action where class benefitted but named plaintiff did not prevail in personal action); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 429–30 (8th Cir. 1970) (individual's lawsuit acted as a "catalyst" for corporate policy changes); *Fogg v. New England Telephone and Telegraph Co.*, 346 F.Supp. 645, 651 (D.N.H. 1972) (plaintiff's complaint with EEOC and lawsuit constituted a "valuable public service"); *Clark v. American Marine Corp.*, 320 F.Supp. 709, 710–11 (E.D.La.1970).

It is true that in this case Ray Wells intervened in a lawsuit begun by the EEOC. In that sense, Wells did not alone obtain benefits for racial minorities at Murphy Motors. However, the Court finds that Wells is deserving of attorney's fees despite the EEOC's participation in the lawsuit. First, 42 U.S.C. § 2000e–5(k), read literally, suggests that Wells is entitled to fees. Wells was a full-fledged party in the lawsuit [1] and clearly prevailed on his claim that the harassment he experienced at Murphy violated Title VII. Second, the attorney for Wells performed most of the trial work and authored the post-trial briefs. The EEOC's role was limited due to the fact that the EEOC lawyer originally scheduled to be present at trial was precluded from appearing for pressing personal reasons.

Third, without an award of attorney's fees, there would be little or no incentive to press suits against racial harassment that violated Title VII when there is little chance that backpay will be awarded. Plaintiffs must not be deterred or inhibited from seeking to enforce civil rights by a refusal to award attorney's fees. *Zarcone v. Perry*, 581 F.2d 1039, 1044 (2d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). Granting fees to Ray Wells will "encourage the vindication of civil rights through private litigation." *Mosby v. Webster College*, 563 F.2d 901, 905 (8th Cir. 1977).[2]

Fourth, the scant case law on the subject indicates that persons who intervene in EEOC lawsuits need not be denied individual attorney's fees. *Alaniz v. California Processors, Inc.*, 13 FEP Cases 738, 742 (N.D.Cal.1976); *Dobbins v. Local 212, IBEW*, 2 FEP Cases 180, 181–82 (S.D.Ohio 1969).[3]

In sum, Ray Wells literally prevailed on his claim that the harassment he experienced violated Title VII. Wells performed a valuable public service through his filing of a complaint with the EEOC and through his intervention in and prosecution of the lawsuit. He therefore deserves reasonable attorney's fees.

### EEOC–Requested Relief

Ray Wells personally experienced harassment at Murphy, but the slurs against black persons in general prove that injunctive relief is necessary, as the EEOC has requested, with respect to all racial harass-

---

1. Neither EEOC nor Murphy objected to Wells' intervention.

2. In *Harrington v. Vandalia-Butler Bd. of Educ.*, 585 F.2d 192 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979), plaintiff proved that the defendant discriminated against her with respect to working conditions, but recovered no backpay or monetary relief. The court held that because she was not entitled to such relief, she could not recover attorney's fees. *Harrington* is distinguishable on the ground that plaintiff's suit in that case

apparently garnered no benefits, injunctive or otherwise, for other school teachers who had suffered from unequal work facilities. The EEOC/Wells suit, in contrast, has obtained injunctive relief benefitting Murphy employees.

3. That a governmental agency provides litigation effort and resources may, of course, reduce the individual plaintiff's fees. *United States v. United States Steel Corp.*, 371 F.Supp. 1045, 1063–64 (N.D.Ala.1973).

ment. The following order includes measures designed to combat such discrimination in the workplace.

*Order for Judgment*

Accordingly, IT IS ORDERED that:

1. Defendant shall take affirmative action to educate and sensitize its supervisors, superintendents, and managers as to the nature of racial and national origin discrimination and as to Title VII's requirement that the terms and conditions of employment be equal for all employees.

2. Defendant shall take affirmative action to educate and sensitize its supervisors, superintendents, and managers, as to Title VII's requirement that work rules be uniformly applied to all employees without regard to their race, color, or national origin.

3. Defendant shall take affirmative action, including the development of written disciplinary measures to be directed against offending employees and officials, to eliminate racial and national origin hostility from its facility in Roseville, Minnesota.

4. Defendant shall take no action, and shall not allow its employees to take any action, which to any degree results in segregation of its work force or facilities based on race, color, or national origin.

5. Defendant shall hire and assign black applicants for employment, and shall promote, transfer, train, demote and dismiss such employees, without regard to race, color or national origin, and shall hire, promote, and transfer employees in such a way as to provide equal employment opportunities to black persons which are equal to those provided to white persons, pursuant to the consent decree entered in *United States v. Trucking Employers, Inc.*, Civil No. 74-453 (D.D.C. March 20, 1974).

6. Defendant shall report to the Court in writing not later than one year after the date of this order as to its compliance with the requirements contained herein, specifically detailing the steps and actions it has taken and the policies it has adopted. The Court retains jurisdiction over this action until further notice.

7. Defendant shall pay intervenor's costs and attorney's fees in this action. In the event that counsel for the parties cannot agree as to a reasonable amount of attorney's fees, intervenor's counsel may, within a reasonable time, apply to the Court for attorney's fees in an amount to be determined at a post-trial hearing.

LET JUDGMENT BE ENTERED ACCORDINGLY.