Paul E. HASKINS, Plaintiff,

v.

OWENS–CORNING FIBERGLAS CORPORATION, Defendant.

Civ. No. 91–1258–JO.

United States District Court, D. Oregon.

Nov. 6, 1992.

Gregory Lamont Gudger, Portland, OR, for plaintiff.

Kenneth E. Jernstedt, Bullard Korshoj Smith & Jernstedt, Portland, OR, for defendant.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

Plaintiff Paul Haskins has charged defendant Owens–Corning Fiberglass, Inc. with employment discrimination based on his race and breach of implied contract. Defendant has moved for summary judgment, which the court grants for the reasons that follow.

## BACKGROUND AND FACTS

Plaintiff, who is black, worked for nine years for Owens–Corning, which manufactures roofing products in Northwest Portland. The start of this action apparently dates back to August 19, 1989, when Haskins had a run-in with a coworker, Geoff Whalley, who is white. Haskins said he was emptying trash containers with a forklift when he noticed that during removal of items inside the dump box the box became wedged on the forks and would not come off.[1] He intended to correct the problem by going to a door post or support pole and

---

1. Although plaintiff opposes the motion for summary judgment, he has not filed a memo to that effect. In ruling on this motion, the court has by necessity relied primarily on documents filed by defendant, including portions of plaintiff's deposition and plaintiff's administrative complaints. The lack of written materials submitted by plaintiff in no way relieves this court of its responsibility to determine if there are disputes of material facts and to view the facts in the light most favorable to the plaintiff.

pulling the box off by angling the forklift up against the box and back out from under it. He was putting this plan into effect when Whalley came over and noted his difficulties.

According to Haskins, he told Whalley what the problem was and asked him to please stand back. Whalley "became very verbal," Haskins said, and called him a "stupid fucker." Haskins told Whalley that he did not need his help and asked him again to move. Whalley was standing to the side when Haskins moved the forklift. Whalley reached in and turned the forklift power off and said, "Get your big ass off the forklift and let's see what you can do about it."

Haskins said as he jumped off the forklift a work knife he had in his pocket dislodged and fell out halfway, and he picked it up to keep it from falling.

Defendant alleges that Haskins hit Whalley with the forklift, which caused them to exchange angry words. At any rate, both plaintiff and defendant agree that the August 19 forklift incident caused their relationship to become strained.

Lenny Erdmann, plant operations manager, says in his affidavit that he told both Haskins and Whalley after the forklift incident that their conduct was unacceptable and that any repeat occurrences would result in their termination.

According to Haskins, the next month Whalley called him a "fucker" and a "son of a bitch" as he walked by. After a second such incident, Haskins reported to Erdmann that Whalley was harassing him because of the forklift incident. Erdmann allegedly said he would talk to Whalley.

Haskins alleges that near the end of September, Whalley called him a "nigger, motherfucker and son of a bitch" and told Haskins that he was going to break his legs; in his affidavit, Whalley denies ever calling Haskins a "nigger." Haskins spoke to Erdmann again about the verbal harassment. Haskins told an investigator from the Civil Rights Division ("CRD") of the state Bureau of Labor and Industries that after the forklift incident, Whalley would make racial comments about every four days, and that Erdmann said he had spoken to Whalley about the harassment but there was not much he could do.

Plaintiff alleges in his complaint that during this same period of time he asked to work different hours than Whalley to avoid the harassment and was placed on a different shift at a reduced rate of pay.

On December 12, 1989, relations between the two men deteriorated further. Haskins, who was working swing shift, got off work at about the time Whalley, who was working graveyard, came on. Haskins said when he walked by, Whalley said, "Fuck off, you nigger, on another day." Haskins said he told Whalley to quit calling him names; after that, Whalley grabbed him. Haskins said he kept Whalley from harming him by holding Whalley's arms behind his back and putting him in a headlock. Whalley then stumbled and fell to the ground.

Defendant tells a somewhat different version of the events of December 12, 1989, alleging that the two men got into a fight and that at one point, Haskins pulled a handgun out of his sweatshirt, pointed it at Whalley and threatened him. Haskins denies pulling a gun on Whalley.

Haskins went home after the fight and then called Erdmann, asking him if he could come back and discuss the incident. Erdmann said he could, but when Haskins arrived he was met by police, who arrested him for menacing. Charges against him were later dropped.

When Haskins was sitting in the police car, plant manager Chris Ruckman told him he was suspended pending an investigation of the incident, according to Ruckman's affidavit. The next day Erdmann and Ruckman completed their investigation and decided to fire both Haskins and Whalley because of the plant's policy calling for automatic dismissal of any employee who fights on plant property. Defendant further alleges that an additional reason for firing Haskins was because he brought a gun onto company property and pointed it at another employee.

Haskins filed a claim with the CRD in June, 1990 in which he alleged he had been discharged because of race. In December of that year, the CRD issued an administrative determination dismissing the charges on the basis that there was no substantial evidence of race discrimination against plaintiff.

In November, 1991, plaintiff filed a complaint charging breach of implied employment contract and wrongful discharge in Multnomah County Circuit Court; defendant, a Delaware corporation, removed that action to this court the next month. Another action charging defendant with employment discrimination because of race in violation of ORS 659.030 was already pending. This court dismissed the employment discrimination action sua sponte without prejudice and granted plaintiff leave to amend his complaint in this action and reallege the discrimination claim.

Plaintiff's second amended complaint is currently before the court. It contains two counts: (1) employment discrimination in violation of ORS 659.030 et seq.; and (2) breach of implied contract.[2] Defendant has moved for summary judgment on both counts.

## STANDARD OF REVIEW

■ If no factual issues exist for trial, then summary judgment is proper. The party opposing the motion must show that the fact in contention is material, that is, that it might affect the outcome of the suit under applicable law. *Lindahl v. Air France*, 930 F.2d 1434, 1436–37 (9th Cir. 1991).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts in front of the court must be drawn in the light most favorable to the nonmoving party.

## DISCUSSION

The statute at issue, ORS 659.030, reads in pertinent part:

(1) ... [I]t is an unlawful employment practice:

(a) For an employer, because of an individual's race, religion, color, sex, national origin, marital status or age ... to refuse to hire or employ or to bar or discharge from employment such individual ...

(b) For an employer, because of an individual's race, religion, color, sex, national origin, marital status or age ... to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

Because Oregon's employment discrimination laws are based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* (1985), *Seitz v. Albina Human Resources Center*, 100 Or.App. 665, 673, 788 P.2d 1004 (1990), Title VII cases are persuasive in interpreting ORS 659.030.

Plaintiff claims that defendant failed to protect him from a racially hostile work environment. One of the first cases to recognize a cause of action based on being subjected to such an environment was *Rogers v. Equal Employment Opportunity Commission*, 454 F.2d 234 (1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), in which the Fifth Circuit wrote:

I do not wish to be interpreted as holding that an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee falls within the proscription of Section 703 [of the Civil Rights Act]. But by the same token I am simply not willing to hold that a discriminatory atmosphere could under no set of circumstances ever constitute an unlawful employment practice. One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers, and I think Section

2. A third count, for wrongful discharge, was dismissed by this court upon defendant's earlier motion. This court ruled that the third claim, for wrongful discharge—that he was entitled to work in a discrimination-free environment— was essentially the same as Haskins' first claim for relief, statutory race discrimination. Additionally, Haskins did not sufficiently and could not allege a claim for wrongful discharge, *i.e.*, that he was terminated for exercising a job-related right or fulfilling a public duty.

703 of Title VII was aimed at the eradication of such noxious practices.

*Rogers,* 454 F.2d at 238.

A district court in Minnesota found that the harassment aimed at a black worker was so severe that it constituted an illegal employment practice, and that the worker's employer took inadequate steps to prevent such harassment. *Equal Employment Opportunity Commission [EEOC] v. Murphy Motor Freight Lines, Inc.,* 488 F.Supp. 381 (D.Minn.1980). The plaintiff in *EEOC* had been subjected to the following harassment: racial epithets written on workplace chalkboards, including a Klu Klux Klan cross; racial epithets written on signs on trucks; verbal racial epithets in the company lunchroom that were so pervasive that plaintiff ate lunch alone in a separate room (which prompted the offending workers to place a sign in that room which said it was for "niggers only"); racially derogatory articles on the company bulletin board; racially derogatory graffiti in the restrooms; slashed tires; and a foul-smelling substance put in his shoes. *EEOC,* 488 F.Supp. at 384–85.

*The employment discrimination claim.*

With the above discussion in mind, I address plaintiff's first claim, which is based on defendant's alleged violation of Oregon's employment discrimination laws. In this personal injury claim for statutory employment discrimination, plaintiff alleges that by failing to protect plaintiff from racial harassment, subjecting him to a racially hostile work environment and terminating him for resisting racial harassment, defendant has violated state law.

To address this claim, three questions are relevant and discussed below.

■ *(1) Was plaintiff subjected to a racially hostile work environment?* According to portions of a deposition of Haskins taken by the defendant, Haskins and Whalley initially had no ill will toward each other, and that they liked each other to the "extent of working together." It was only after the forklift incident that their relationship went downhill and Whalley started calling Haskins names, allegedly including racial epithets.

Apparently Whalley was the only Owens–Corning worker who referred to Haskins in derogatory racial terms. From portions of his deposition, it appears that Haskins was on friendly terms with many of his co-workers and I find no evidence of pervasive, institutionalized racism in the Owens–Corning workplace.

The *EEOC* court's discussion of harassment in the workplace is instructive:

First, more than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, ... are accidental, or are sporadic do not trigger Title VII's sanctions.

*EEOC,* 488 F.Supp. at 384. I also look to *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), in which the Supreme Court said:

Of course, as the courts in both *Rogers* and *Henson* [*Henson v. Dundee,* 682 F.2d 897 (11th Cir.1982) ] recognized, not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. See *Rogers v. EEOC, supra,* at 238 ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII); *Henson,* 682 F.2d at 904 (quoting same) ...

*Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405.

As reprehensible as the court finds Whalley's alleged use of racial epithets, based on the above cases, such use does not appear to rise to the level of pervasive workplace harassment required for an employment discrimination action. While Whalley's alleged comments were no doubt extremely hurtful and irritating to Haskins, they do not appear to be a part of a pattern of racial harassment at Owens–Corning. Rather, they appear to stem from a simmering dispute between the two employees. Whalley provoked Haskins by allegedly calling him a "motherfucker" and "son of a bitch;" if he did indeed add "nigger" to the

list it would appear to be part of his stepped-up efforts to get under Haskins' skin by referring to its color.

As Judge Frye said in a similar employment discrimination case, "The fact that isolated instances of racial slurs occurred ... is deplorable but not compensable." *Ivory v. Boise Cascade Corporation*, 43 F.E.P. 1642, 1643, 1987 WL 109055 (D.Or. 1987). That expresses my sentiments in this case, and as such I find plaintiff has not made a case that he was subjected to pervasive racial harassment to such an extent that he was forced to work in a hostile environment.

*(2) Did defendant fail to protect plaintiff from racial harassment?* In *EEOC*, the Third Circuit said the first condition for finding a Title VII violation is that the racial harassment must take the form of more than a few isolated instances (see above). The second condition is that plaintiff must show that the employer failed to take reasonable steps to prevent the racial harassment. *EEOC*, 488 F.Supp. at 385. The Third Circuit went on to say that:

> ... [T]he standard for a violation of Title VII should be stricter than that of actual participation by management and supervisory personnel. If management knows or should know of incidents of racial harassment that are more than sporadic, it has a responsibility to take reasonable affirmative steps to eliminate such incidents.

*EEOC*, 488 F.Supp. at 386. Oregon courts have also said that employers must take steps to prevent harassment. *Holien v. Sears, Roebuck and Co.*, 298 Or. 76, 90, 689 P.2d 1292 (1984).

■ An employer's liability for harassment of an employee by a co-worker kicks in when the employer knew or should have known of the harassment. As to the material fact of whether or not plaintiff's supervisor (and thus his employer) knew about the racial harassment, there is a dispute. Defendant says that Owens–Corning had no knowledge of the racial harassment, and that although Haskins complained to his supervisor about general harassment (the name calling, etc.) he never told him that the harassment included the use of racial epithets.

Defendant points to statements that plaintiff made to a CRD investigator in support of its position, arguing that on two occasions, plaintiff told the investigator that he had never complained specifically about racial harassment to his supervisor.

Plaintiff says in his complaint he reported this racial harassment to management personnel at Owens–Corning and they took no action; thus, I find there to be a dispute over material facts regarding this question.

However, because plaintiff has not established the first prong of his employment discrimination claim—that of the existence of a racially hostile work environment—I find that he does not establish a claim, even if the facts regarding the second prong are viewed in the light most favorable to him.

■ *(3) Was plaintiff fired in retaliation for resisting racial harassment?* Plaintiff, to prove a claim under ORS 659.-030, must show that he was discharged for some unlawful reason (in this case, for resisting racial harassment). *Bell v. First Interstate Bank*, 103 Or.App. 165, 168, 796 P.2d 1226 (1990).

Without an opposition memo from plaintiff, I must speculate as to his theories regarding this claim. One theory might be that by taking matters into his own hands, and scuffling with defendant, he was resisting racial harassment. Because he alleges that he told defendant of the racial harassment, he might also argue that his termination was in retaliation for complaining about such harassment.

As to the issue of whether or not plaintiff pulled a gun, I find a dispute of fact. However, I find that dispute not material because I need only look to the prohibition against fighting to address the question of whether or not defendant discharged plaintiff for an unlawful reason.

Owens–Corning had a policy that read: "Fighting on plant property will result in automatic dismissal." Haskins signed a form containing the policy, which I find is evidence he knew about the policy. *Rose City Transit v. City of Portland*, 271 Or.

588, 594–595, 533 P.2d 339 (1975). He and Whalley got into a fight on plant property. Both men were fired. Who provoked the fight is not relevant here; both men were involved in the fight and both men were fired. I find plaintiff was fired because he violated a company policy that carried the penalty of automatic dismissal, and I find no evidence that he was discharged for some unlawful reason.

### The breach of implied contract claim.

Plaintiff alleges that he had an implied contract with defendant that no final action would be taken regarding his employment status until defendant had completed the conflict-resolution procedures outlined in its employee manual.

He also alleges that he had an implied contract for lifetime employment as long as he did good work.

▨ The general rule in Oregon is that employees are at-will; that is, their employers may discharge them at any time and for any reason absent a contractual, statutory or constitutional requirement. *Patton v. J.C. Penney Company, Inc.*, 301 Or. 117, 120, 719 P.2d 854 (1986). However, statements in personnel handbooks or employment manuals can create implied contracts requiring that employers have just cause for terminating employees. *Yartzoff v. Democrat–Herald Publishing Company*, 281 Or. 651, 576 P.2d 356 (1978).

▨ Defendants have submitted a copy of Owens–Corning's employee handbook, which plaintiff apparently read. A clause providing for termination of an employee for just cause would change an employment contract from one terminable at will to one terminable only for just cause; however, I find no such clause in the Owens–Corning handbook. Additionally, I find one clause that I construe as stating that Owens–Corning employees are at will:

> Keep in mind that completion of the probationary period is no guarantee of permanent employment. Throughout your career you will be expected to achieve the high standards of performance that will keep Owens–Corning successful.

*See Madani v. Kendall Ford, Inc.*, 102 Or.App. 478, 484, 794 P.2d 1250, *aff'd in part, rev'd in part*, 312 Or. 198, 818 P.2d 930 (1991) (citing an assurance of steady employment as long as the employee is productive and a provision for a probationary period as evidence to be considered in determining if an employee could be fired at will or only for cause).

▨ An employer's policies can become part of the contract it has with its employees. *Sabin v. Willamette–Western Corporation*, 276 Or. 1083, 1089, 557 P.2d 1344 (1976). Thus, the written policy against fighting on company grounds—and the provision that to do so would result in termination—was a part of the contract between Haskins and Owens–Corning.

▨ Prohibited behavior (such as fighting on company grounds) can also be used in considering what constitutes cause if an employee can only be fired for cause. *Mandani*, 102 Or.App. at 484, 794 P.2d 1250. Thus, even if Haskins could only be fired for cause, fighting on company property would fit that definition.

▨ The handbook provides for a "corrective action procedure" to be used in attempting to "correct minor problems." However, it provides the following caveat: "Serious problems, with outright disregard for accepted standards of conduct, will result in suspension or termination." Because the policy sheet lists fighting on company grounds as subject to immediate termination I find it a "serious problem" not subject to the corrective action procedure.

Plaintiff alleges that he was told on several occasions during the course of his employment at Owens–Corning that he would have a job for life and until he retired, as long as he did good work.

▨ The court assumes that plaintiff is arguing that he had an implied contract for long-term employment, which prevented Owens–Corning from terminating him without cause. However, "[s]uch a contract cannot be created by mere casual or unauthorized comments." *Butler v. Portland General Electric*, 748 F.Supp. 783, 792 (D.Or.1990), *aff'd*, 958 F.2d 377 (1992).

Additionally, as explained above, even if Haskins were found to be an employee who could only be fired for cause, fighting on company grounds would qualify as cause.

CONCLUSION

An unfortunate series of events lead to the termination of Haskins. Viewing the facts most favorable to him, it appears that plaintiff was harassed verbally by a co-worker who used racial epithets as part of that harassment. Plaintiff, by requesting a transfer, attempted to head off a confrontation with the allegedly belligerent co-worker. However, while defendant may have showed poor judgment in failing to make a greater effort to resolve the differences between the two employees—a failure that resulted in the termination of Haskins, a nine-year employee—it is not liable under the theories put forth by Haskins in this complaint.

Defendant's motion for summary judgment, #44, on the claims of (1) employment discrimination and (2) breach of implied contract is GRANTED.