David KOEPPING, Plaintiff–Appellant,

v.

TRI–COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON; Jerry Williams, Defendants–Appellees.

No. 95–36151.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1997.

Decided July 24, 1997.

Stephen Brischetto, Portland, OR, for plaintiff–appellant.

Thomas W. Sondag, Lane, Powell, Spears, Lubersky, Portland, OR, for defendants–appellees.

Before: FLETCHER and TASHIMA, Circuit Judges, and SCHWARZER,* District Judge.

FLETCHER, Circuit Judge:

David Koepping appeals the grant of summary judgment to defendants Tri–County Metropolitan Transportation District and Jerry Williams (collectively "Tri–Met") in his suit for breach of contract, breach of the duty of good faith and fair dealing, violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213,[1] violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and deprivation of a property right without due process of law under 42 U.S.C. § 1983. Koepping contends that he raised triable issues of fact as to whether Tri–Met could fire or demote him only for cause. We agree. Accordingly, we reverse the district court's grant of summary judgment on Koepping's claims of breach of contract and breach of the duty of good faith and fair dealing. We affirm the dismissal of Koepping's claims under the ADA, the Rehabilitation Act of 1973, and 42 U.S.C. § 1983.

## I. FACTS

Koepping began working for Tri–Met in 1974 as a bus driver. In 1982 he was promoted to the position of foreman in the Building and Grounds Department. Persons holding this position were in a bargaining unit covered by a collective bargaining agreement ("CBA"). Under it, foremen could be removed only for cause. In 1990, Tri–Met petitioned the Oregon Employment Relations Board to remove the foreman position from the CBA and change the position to supervisor.[2] At a series of meetings held in Tri–Met's central office in January 1989 and February 1990, while this petition was pending, the foremen expressed concerns that they would be fired if their positions were removed from the protection afforded them by the CBA. Gary Brentano, the Department Director, told the foremen present, including Koepping, that "as long as he felt we were all doing good work, as long as we continued to do good work, there would be no problem. And he gave us assurances that our jobs were secure." On April 1, 1990 the foremen positions were removed from the bargaining unit and the title of the job was changed to supervisor, an unclassified position under Oregon law. Or.Rev.Stat. § 243.650(23) (1996).[3]

Shortly after the reclassification of his position, Koepping spoke with Tri–Met's personnel director, Carolyne Nelson, to review Tri–Met's Performance Evaluation Program. Koepping stated that during the interview he was given a packet of information and told about the evaluation process by which his performance would be evaluated. This program promises employees a "fair and objective" method to identify "how employees are doing relative to job requirements."[4] It promises employees that there will be agreement as to performance objectives and standards, annual timely evaluations based upon the standards subject to a "right to contest and appeal" a rating. If an employee's per-

* Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

1. In 1988, Koepping was injured in an automobile accident and could not return to work for five months. At issue was whether the accident left him with any residual disabilities.

2. Under the Oregon Administrative Rules for the Oregon Employment Relations Board (ERB), OAR 115–225–005 through 115–225–060, a public employer may petition the ERB to clarify whether certain positions should remain in the bargaining unit. Prior to filing such a petition, the public employer is required to exhaust any pending grievance in process which might resolve the issue. If objections are received, the ERB holds a formal contested case hearing under OAR 115–25–045.

3. Unclassified employees have no job security under Oregon law. Or.Rev.Stat. § 240.240(1) provides that with the exception of laws, rules, and policies concerning salary and leave with pay, the provisions of Chapter 240 of Oregon Laws-which include statutes mandating discharge for cause only as well as a right to a hearing-do not extend to employees in unclassified service.

4. Tri-Met has an Office Administration and Personnel Manual ("the O & A Manual"), which it distributes to management personnel, and a Performance Evaluation Program Manual ("the PEP Manual"), which contains the full instructions for evaluating and appraising the performance of non-bargaining unit employees and is only distributed to employees of Tri–Met's Personnel Department.

formance is deficient, the program suggests that managers identify "specific assistance that will be made available to aid the employee in improving performance."

In February of 1991, Williams, Koepping's supervisor, formally evaluated Koepping's job performance from July 1, 1990 to October 1, 1990. This evaluation was Koepping's first, and only, evaluation as a non-represented management employee. Williams evaluated Koepping in the following job areas: problem solving, managing organization change, technical competence, managerial communication, managerial leadership, maintenance of physical facilities and equipment, and professional development. In every category Williams evaluated Koepping's performance as good to very good. In August 1991, Williams appointed Rockchild Scott to supervise Koepping. No one told Koepping that Scott was his supervisor. Scott formed negative opinions of Koepping's performance and reported these to his superiors, Williams and Brentano.

In March 1992, Koepping met with Williams, who informed him that he was being removed from his supervisor position because of performance problems. The problems were allegedly that Koepping had failed to attend managerial meetings, that there were morale problems among the people that he supervised, and that he did not support certain Tri–Met management decisions. Williams stated that he had several conversations with Koepping about these concerns prior to the demotion; Koepping denies these conversations occurred.

Koepping requested a written statement of these problems, which Williams supplied on April 8, 1992. On April 1, 1992, Koepping met with Tri–Met's General Manager Tom Walsh and on April 15, 1992 he submitted a letter to Deputy General Manager Post claiming that the deficiencies were false, exaggerated, and "nothing more than untruthful allegations and spiteful hearsay." On June 26, 1992, Koepping was removed from his position as Facilities Maintenance Supervisor. On July 26, 1993, Post notified him by letter that the demotion would stand.

Koepping was originally informed that he could move into a Plant Electrical Mechanic position, but would be required to take a physical examination to obtain the job. The union and Tri–Met disputed the appropriate pay for the newly created Plant Electrical Mechanic position and Tri–Met withdrew the offer. Under the CBA, Koepping had bumping rights to a Plant Maintenance Mechanic job. He exercised them and obtained a position as a Plant Maintenance Mechanic, where he continued to work during the proceedings in the District Court.[5]

Koepping filed complaints of disability discrimination with the EEOC. Within 90 days of the EEOC's dismissal of his claim, he filed suit in District Court claiming breach of contract, breach of the duty of good faith and fair dealing, violation of the Americans with Disabilities Act, violation of the Rehabilitation Act of 1973, and deprivation of a property right without due process of law under 42 U.S.C. § 1983.

Defendants moved for summary judgment on all claims. Magistrate Judge Ashmanskas issued a Findings and Recommendation granting defendant's motion as to plaintiff's ADA and Rehabilitation Act, and willful and malicious breach claims, and denying the motion as to the remaining claims.[6] The case was scheduled for a jury trial on the remaining claims for breach of contract, breach of the covenant of good faith and fair dealing, and 42 U.S.C. § 1983. Defendants then moved for reconsideration of the denial of summary judgment, or, in the alternative, to

**5.** Koepping then filed a claim with the Workers Compensation Board ("Board") for stress resulting from his removal as supervisor. A hearing officer denied his claim. On appeal, the Board concluded that Koepping "was secretly supervised by someone the company deliberately did not identify as claimant's supervisor, then he was summarily removed from his position." Such actions were unusual, the Board stated. Ordinarily, a "mid-level manager like the claimant would be confronted directly and promptly by his superiors for failing to attend management staff meetings." This, the Board concluded, did "not constitute reasonable discipline." The Board ordered the claim accepted.

**6.** Use of the term "Recommendation" is a clerical error because the parties had earlier consented to the disposition of this case by the magistrate judge, pursuant to 28 U.S.C. § 636(c)(1).

certify to the Oregon Supreme Court the question of whether under Oregon law a general promise of "secure" employment can give rise to an implied-in-fact contract modifying an at-will employment relationship. The court then issued an order reconsidering the denial of summary judgment and granted defendants' motion for summary judgment of the remaining claims. This appeal followed.

## II. ANALYSIS

### A. Creation of An Implied Employment Contract

■ We review the grant of summary judgment de novo. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). Under Oregon law, there is a legal presumption that absent a contractual, statutory or constitutional requirement, an employer may discharge an employee at any time and for any reason. *Patton v. J.C. Penney Co.*, 301 Or. 117, 719 P.2d 854, 856 (1986); *Brett v. City of Eugene*, 130 Or.App. 53, 880 P.2d 937, 939 (1994). We must decide whether Koepping raised any genuine issues of material fact as to whether he and Tri–Met agreed to modify his at-will status. We find that he has.

Oregon subscribes to the objective theory of contract interpretation, which requires a court to look not at the parties' subjective understandings, but at their communications and overt acts. *See City of Canby v. Rinkes*, 136 Or.App. 602, 902 P.2d 605, 610 (1995) (whether parties entered into an agreement depends not on whether their 'minds met' but on whether the parties agreed to the same, express terms and on whether those terms constitute an enforceable agreement); *Real Estate Loan Fund Oreg. Ltd. v. Hevner*, 76 Or.App. 349, 709 P.2d 727, 730 (1985) ("In determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts.").

■ Koepping made a clear manifestation of his intent to modify his at-will status when he agreed to stay on in his position as a non-represented managerial employee in reliance upon Brentano's promise that his job was secure as long as he continued to do good work.[7]

■ The district court rejected Koepping's assertion that Brentano's statement that "the jobs are secure as long as you're doing good work" converted Koepping's at-will employment status to one that was terminable only for cause because "[e]mployment contracts cannot be created by 'mere casual or unauthorized comments,'" (citing *Butler v. Portland Gen. Elec. Co.*, 748 F.Supp. 783, 792 (D.Or.1990), aff'd sub nom. *Flynn v. Portland Gen. Elec. Co.*, 958 F.2d 377 (9th Cir. 1992)).

We conclude that the uncontroverted facts suggest that Brentano's statement was neither casual nor unauthorized. Brentano made it during a series of meetings with Koepping and other foremen who had expressed concerns about their future employment security. These meetings were held during the pendency of the state administrative proceedings by which Tri–Met sought removal of the foremen from the employment protections of the CBA, which required "just cause" to discharge them. At these meetings the foremen expressed concern that there would be "a hatchet job" if they were removed from the bargaining unit. They asked what protection they would have if they came out of the bargaining unit.

In that context, Brentano's statement: "as long as he felt we were all doing good work, as long as we continued to do good work, there would be no problem," may well have created an implied contract not to fire the foremen except for cause. No one controverts the fact that this promise was made to assure the foremen that they would be secure after their positions were removed from the legal protection afforded by the CBA. Whether it was made to secure their cooperation during the pendency of the administrative reclassification procedure is a disputed issue of material fact.

---

7. *Albrant v. Sterling Furniture Co.*, 85 Or.App. 272, 736 P.2d 201, 203 (1987) holds that an employer may modify an at-will employment contract so long as the modification applies only prospectively. An employee impliedly accepts such modifications by continuing employment after the modification.

In *Seibel v. Liberty Homes, Inc.*, 85 Or. App. 261, 736 P.2d 578 (1987), *aff'd*, 305 Or. 362, 752 P.2d 291 (1988), the employer's offer of permanent employment "as long as [defendant has] production to run" was made under oath at a worker's compensation hearing in which the plaintiff sought permanent total disability benefits. The court reasoned, "[a] jury could conclude that such an unusual offer of employment" had been "extended to avoid what the employer may have perceived as a probable award of permanent total disability to plaintiff." *Id.*, 736 P.2d at 579. In *Langendorf United Bakeries, Inc. v. Moore*, 327 F.2d 592, 595 (9th Cir.1964), we found that a jury could reasonably conclude that a promise of permanent employment that was collateral to the sale of plaintiff's Portland, Oregon, bakery and his agreement not to compete for five years, was an enforceable contract. It was dispositive that this promise was made "where the services [desired by the promisor] were peculiarly necessary to the employing corporation and involved a substantial change of position on the part of the employee." *Id.*

Here, too, Brentano's promise was given in return for the loyalty of the foremen, who were valuable, long-term employees of Tri-Met, and whose legal right to be fired only for just cause was about to be lost as a result of the removal of their jobs from the CBA. Under these "extraordinary" circumstances, a reasonable jury could conclude that this promise created an enforceable employment contract to fire the foremen only for cause. *See Id.* ("The extraordinary nature of the lifetime employment contract has ... led to rejection of submitting such a question to the jury in cases involving nothing more than a simple hiring of an employee. But the courts have increasingly recognized apparent authority to make such a contract where there are additional circumstances which would render such a promise not unreasonable in the light of that which is bargained for.").

The authority relied upon by appellees is factually different. In *Butler*, the promise of continued employment was directly contradicted by language in a generally-distributed employee manual stating that employment was at-will and could be terminated at any time by either party. *Butler*, 748 F.Supp. at 792. It was therefore not reasonable for the employee to rely upon the employer's promise of continued employment. In *Wooton v. Viking Distrib. Co., Inc.*, 136 Or.App. 56, 899 P.2d 1219, 1223 (1995), the statement "[the employee] could work there long term and retire from the company if all went well and if everyone was pleased with my work," was characterized merely as an expression of "mutual hope." Brentano's promise, in contrast, was not a generalized statement relating to future employment; it was a specific statement of the employment rights that would be afforded to the foremen subsequent to their removal from the protections of the CBA. In *Haskins v. Owens–Corning Fiberglas Corp.*, 811 F.Supp. 534 (D.Or.1992), a statement that the plaintiff would "have a job for life" was contradicted by an employee manual which specifically stated that "completion of the probationary period is no guarantee of permanent employment," and by a written policy that an employee found fighting on company property, as the plaintiff was, would be subject to immediate termination. *Id.* at 540.

■ While we agree with the Seventh Circuit that "[a] casual remark made at a meeting, a phrase plucked out of context, is too fragile a base on which to rest such a heavy obligation inherent in [an implied contract of employment]," *Mursch v. Van Dorn Co.*, 851 F.2d 990, 997 (7th Cir.1988), we find that Brentano's promise, evaluated in context, supports an inference that an oral employment contract was created.

■ The district court found Brentano's promise to be unauthorized. Under Oregon law, an employer may be held liable for contracts made by its agent, if the employer has by words or conduct led third parties to believe that the agent has authority and the third party actually believes the agent is authorized on the basis of the employer's statements or conduct. *Filter v. City of Vernonia*, 64 Or.App. 559, 669 P.2d 350, 353 (1983) (statements made in employee manual distributed by chief of police created binding obligations for city if chief had apparent authority to do so); *Wiggins v. Barrett & Assoc., Inc.*, 295 Or. 679, 669 P.2d 1132, 1144

(1983) (Oregon municipal entities may be held liable for unauthorized contracts made by their agents with apparent authority). Appointment of an employee to a management position is conduct that suggests that the agent has the authority to make management decisions, including the creation of employment contracts. *See Filter*, 669 P.2d at 352 (citing Restatement (Second) of Agency §§ 8, cmt. c, 27, 59). In the absence of evidence to the contrary, a general manager has the power to enter into employment contracts. *Doolittle v. Pacific Coast Safe & Vault Works*, 79 Or. 498, 154 P. 753, 755 (1916). Under Oregon law, whether or not an employee was acting within the scope of his employment is a question of fact for the jury to decide. *Stanfield v. Laccoarce*, 284 Or. 651, 588 P.2d 1271, 1274 (1978).

All the evidence seems to point to both actual and apparent authority to bind Tri–Met to an employment contract. Brentano had been employed by Tri–Met for 20 years, 17 of those years as a manager. He had been the Director of Bus Maintenance since 1979 and was responsible for the management of three Tri–Met operating divisions. His promise was made during a meeting held in Tri–Met's central administrative offices. Given Brentano's long tenure as a management representative for Tri–Met and the official nature of the meeting, it was reasonable for Koepping to rely upon his promise as one authorized by Tri–Met.

Additionally, we conclude that Koepping produced sufficient evidence from which a jury could infer that Tri–Met's Performance Evaluation Program created an implied limitation on its ability to discharge for poor performance. The district court correctly found that

> nothing in [the O & A Manual and the PEP Manual] requires an employee to be progressively disciplined before being terminated or demoted. The manuals state that a superior '*may* wish to schedule' a special evaluation for an employee with poor performance, and that an employee '*may* be subject to termination after the appropriate evaluation period(s).' This language, however only states that the

evaluation may be done; it does not require them to be done.

The district court erred, however, in concluding that Koepping failed to raise triable issues of fact concerning his claim that Tri–Met's custom and practice of implementing this program modified his at-will employment contract.

Koepping testified that, after his position had been converted to a non-represented managerial position, Tri–Met's personnel director Nelson:

> had an interview with me in which she told me of the—she gave me a management packet of information, and she told me about the evaluation process in which during the course of the conversation she told me that—about how a manager documents performance and everything. And so what I got out of our conversation was that—which I knew to be, as a long-time supervisor—I knew to be a long-time practice at Tri–Met, you had to have documentation. This was what was required of me as a supervisor, to have documentation on anybody that I recommended for discipline. . . .

Tri–Met's Performance Evaluation Program promises that managers will use "a fair and objective means for identifying how employees are doing relative to job requirements." It sets forth specific standards for measuring performance and requires adherence to procedures in determining performance including a specific schedule for written evaluation on at least an annual basis. It defines a system of five rating levels for performance. It includes a procedure to assure that employees "agree upon job performance standards." It sets forth a requirement that managers "detail the specific assistance that will be made available to (employees)" with deficient performance; and it grants employees a "right to contest and appeal a formal evaluating rating" that "shall be final and binding."

Brentano, who made the decision to demote Koepping, stated that the policy and procedure at Tri–Met for removing a supervisor would "reasonably follow a period of counseling and some notification to the employee of the deficiency." In Koepping's

case, Brentano stated that "if he was not aware [of the reasons for his demotion] ... he should have been made aware." Brentano also stated that he regularly did performance evaluations with his subordinates, and that he understood Tri–Met's policy to require annual evaluations. Other Tri–Met supervisors stated that they regularly used progressive discipline.

Tri-Met asserts that Koepping was never explicitly told that he could only be removed from his position after compliance with any review process; that Koepping's knowledge of Tri–Met's practice came from his own discipline of union employees, who were covered by the CBA; and that Koepping only saw the O & A and PEP Manuals after he was removed from his position.

We conclude that material issues of fact remain as to whether it was reasonable for Koepping to rely upon Tri–Met's policy of following its internal regulations and provide its employees with notice of performance problems, and the opportunity to try and correct them, before being terminated.

## B. Breach of the Obligation of Good Faith and Fair Dealing

▮▮▮▮ Under Oregon law, parties to a contract are subject to an implied duty of good faith. *Sheets v. Knight*, 308 Or. 220, 779 P.2d 1000, 1008 (1989). The contractual good faith doctrine is designed to "effectuate the reasonable contractual expectations of the parties." *Best v. United States Nat'l Bank*, 303 Or. 557, 739 P.2d 554, 563 (1987). If the parties agree to restrict the right to terminate at will, the duty of good faith applies to the restrictive terms. *Elliott v. Tektronix, Inc.*, 102 Or.App. 388, 796 P.2d 361, 365 (1990). On appeal, Koepping argues that he raised issues of material fact as to whether Tri–Met's failure to follow its own performance evaluation policy violated this duty of good faith and fair dealing. We agree.

Because we conclude that Koepping has established the existence of triable issues of fact as to whether he had an implied-in-fact contract with Tri–Met not to terminate him without good cause, we remand his claim for breach of an implied covenant of good faith

and fair dealing. *See Elliott*, 796 P.2d at 365 (proof of the existence of a performance evaluation system promised to employee created a question of fact as to whether the policy is a restriction on the right to termination).

## C. § 1983 Claim

▮▮▮▮ The Fourteenth Amendment protects against the deprivation of property without procedural due process. *Brady v. Gebbie*, 859 F.2d 1543, 1547 (9th Cir.1988) (citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). In order to state a claim under 42 U.S.C § 1983 for his dismissal Koepping must, as a threshold matter, establish that he had a property right in his position. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (a government employee is not entitled to due process based on deprivation of property when removed from a position unless he has a legitimate claim of entitlement to the position). This entitlement must be granted by state law. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1154–55, 71 L.Ed.2d 265 (1982) (the position holder needs an entitlement grounded in state law, which cannot be removed except for cause). Under Oregon law, public employee tenure rights arise solely from statutes or regulations adopted pursuant to them. *Brady*, 859 F.2d at 1549 (citing *Papadopoulos v. Oregon State Bd. of Higher Educ.*, 14 Or.App. 130, 511 P.2d 854, 867 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974)). Koepping's claim under § 1983 was properly dismissed because "even if [Koepping] could show an implied contract of employment that he could only be fired for cause, he could not assert a property right based on that contract unless the contract was made pursuant to a statute or authorizing regulation." *Brady*, 859 F.2d at 1549; *see Papadopoulos v. Oregon State Bd. of Higher Educ.*, 511 P.2d at 872 ("Employment contracts of public employes may create rights to continued employment over and above that provided by statute or regulation. But such an employment contract, standing alone, does not create the kind of interest that triggers the requirement of a due process hearing before

the government withdraws the benefits of the contract, i.e. breaches it. *In such a situation, the public employee's remedies are measured by the law of contracts, not by constitutional law."*) (emphasis added).

### D. ADA & Rehabilitation Act Claims

 Koepping's discrimination claims under the ADA and § 504 of the Rehabilitation Act were properly dismissed. To survive a summary judgment motion, Koepping would have to show that Tri–Met took an adverse action because of a disability. *Doe v. Atty. Gen. of U.S.*, 34 F.3d 781, 784 (9th Cir.1994). His claims are based entirely on the fact that Tri–Met requested that he take a physical exam before starting in the Plant Electrical Mechanic position.[8] Koepping never took the exam, and this did not bar him from serving in the Plant Maintenance Mechanic position that he subsequently accepted. He adduced no evidence that the decision to demote him was related to the exam request for the position he was being transferred into.

Koepping claims that the district court did not consider his second claim, that it was discriminatory even to request such an exam, but the district court states: "Merely requiring someone to take a physical at the most shows concern for whether the person will be able to handle their new position and not discriminatory motive."

 Koepping is correct in asserting that under the ADA, a claim lies for a discriminatory demand for a medical exam once an employee enters on duty, unless the exam or inquiry is job-related or consistent with business necessity.[9] However, here, the EEOC found that Tri–Met did not violate the ADA because 1) the request for an exam occurred after he was demoted and before he entered his new job; 2) Koepping never took the exam and no additional adverse action resulted. We agree.

**8.** Tri-Met claimed that the job involved lifting and that it wanted Koepping to take the exam so that it could make appropriate accommodations if a 1988 accident had left him partially disabled.

**9.** 42 U.S.C. § 12112(d)(1) defines discrimination: "(T)he prohibition against discrimination ... shall include medical examinations and inqui-

### III. CONCLUSION

We REVERSE the district court's grant of summary judgment on the breach of contract and breach of the duty of good faith and fair dealing claims. We AFFIRM the dismissal of the claims under the ADA, 42 U.S.C. § 12101–12213, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 42 U.S.C. § 1983. On appeal, each party shall bear its own costs. Appellants request for attorney's fees is denied. We remand to the district court so that it can exercise its discretion over whether to retain jurisdiction over the state law claims or whether to dismiss these claims without prejudice so that they may be pursued in state court.

AFFIRMED in part and REVERSED in part.

ries." Specifically, an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such an employee is an individual with a disability ...." except in limited job-related or business necessity circumstances. 42 U.S.C. § 12112(d)(4)(A).